**AEROGROUP INTERNATIONAL, INC., Plaintiff,**

v.

**MARLBORO FOOTWORKS, LTD., Laurence D. Koplan, Steven Goldberg, Gredico Footwear Ltd., Town Shoes Ltd., Bata Industries Ltd., Goldport Enterprises, Inc., Marlboro Footworks Ltd., (Taiwan), Masateru Uehara, Frederick Atkins, Inc., Weiss & Neuman Shoe Co., Melville Corporation, Shoe Carnival, Inc., and National Independent Retailers, Inc., Defendants.**

No. 96 Civ. 2717 (DLC).

United States District Court,
S.D. New York.

Feb. 4, 1997.

Vito R. Vincenti, Bart J. Eagle, Paul J. Vincenti, Law Offices of Vito R. Vincenti, P.C., New York City, for Plaintiff Aerogroup, Int'l, Inc.

William M. Dallas, Jr., Michael J. Bowe, Sullivan & Cromwell, New York City, for Defendant Bata Industries Ltd.

Charles R. Hoffman, A. Thomas Kammer, Alan M. Sack, Hoffman & Baron, Jericho, NY, for the Marlboro Defendants.

## OPINION AND ORDER

COTE, District Judge:

Plaintiff Aerogroup International, Inc. ("Aerogroup") has brought this action against Marlboro Footworks Ltd. ("Marlboro"), an American buying agent, and certain of its American and Canadian customers, alleging that the defendants have infringed its intellectual property rights in its Aerosoles shoes. Marlboro and one of its Canadian customers, Bata Industries Ltd. ("Bata"), have moved to dismiss this action insofar as it seeks to reach Canadian sales for lack of subject matter jurisdiction.[1] At issue is the extraterritorial reach of the Lanham Act and the Patent Act. This Court finds that the

---

1. Although described both by the parties and by courts as an issue of subject matter jurisdiction, this issue is more appropriately viewed as whether plaintiff has stated a cause of action. There can be no dispute that this Court has subject matter jurisdiction over any and all claims brought under the Lanham Act. The issue, rather, is whether the conduct alleged gives rise to a cause of action under the Lanham Act. *See Fogel v. Chestnutt,* 668 F.2d 100, 105–07 (2d Cir.1981) (Friendly, J.) (discussing the distinction between dismissal for lack of subject matter jurisdiction and dismissal for failure to state a claim), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

Lanham Act applies to Marlboro's actions in Canada, but that it does not provide subject matter jurisdiction over Bata for its Canadian sales.[2] Moreover, this Court holds that Aerogroup's patent claims do not extend to Canadian sales.

## I. *Background*

### A. *Procedural History*

On April 17, 1996, Aerogroup filed this action alleging violations of several provisions of the Lanham Act, 15 U.S.C. §§ 1114(1), 1120, 1125(a), and 1125(c); the Patent Act, 35 U.S.C. § 271; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"). Plaintiff also brought various state-law claims.[3] On October 21, 1996, after a hearing on Aerogroup's motion for a preliminary injunction against Marlboro and two individual defendants, Steven Goldberg and Laurence D. Koplan, Aerogroup and these three defendants consented to a conversion of the hearing to a full trial on the merits. Thereafter, in an opinion delivered on the record, this Court granted in part and denied in part Aerogroup's motion. The permanent injunction reflecting this ruling was signed on November 15, 1996. Neither the October 21 Opinion nor the November 15 Order addressed the extraterritorial effect of the Lanham Act on Marlboro's Canadian sales. Instead, the Court invited the parties to address this issue through post-trial submissions, which the parties have done.

Three of the defendants are Canadian customers of Marlboro. On December 24, 1996, this Court granted the motions of defendants Town Shoes and Gredico to dismiss the action against them for lack of personal jurisdiction.[4] Bata, the remaining Canadian defendant, has moved to dismiss the action

against it on the grounds of lack of personal jurisdiction and subject matter jurisdiction and pursuant to the doctrine of forum non conveniens. At trial, this Court found that Marlboro had infringed the Aerosoles trademark if American law were to apply to sales of certain shoes by Bata in Canada.

While Aerogroup and Bata have not engaged in discovery, both parties have submitted evidence in connection with Bata's motions. In addition, Aerogroup has had complete discovery of Marlboro, the company through whom Bata ordered the infringing shoes, except for some additional discovery which may be needed to finalize the amount of damages.

### B. *Aerogroup*

Since 1985 Aerogroup (or its predecessor) has designed, manufactured, imported, marketed and sold at wholesale and retail shoes of various types including the Aerosoles shoe. Aerosoles are manufactured in factories throughout Europe and Sri Lanka and sold in large quantities throughout the United States, Canada, and other parts of the world. Aerogroup claims the following intellectual property rights in connection with its Aerosoles shoe: (1) a United States registered trademark which includes the name "Aerosole" in stylized letters with a twisting line underneath that curves back and forth three times ("Aerosoles Trademark"); (2) a United States registered waffle design trademark which includes a "plurality of diamond or rhombic recessed patterns on the sole of a women's" shoe ("Waffle Trademark"); (3) a pending United States trademark which includes the image of a shoe being twisted on a vertical axis to denote flexibility ("Twisted Shoe"); (4) a United States patent on the

---

2. Aerogroup asserts claims against Bata for false designation or origin, false description, false representation and infringement of trade dress under 15 U.S.C. § 1125(a), trademark infringement under 15 U.S.C. § 1114(1), patent infringement under 35 U.S.C. § 271, and dilution under 15 U.S.C. § 1125(c)—all federal law claims. Because I find that the Lanham Act and Patent Act do not apply extraterritorially to Bata's actions in Canada, there is no remaining basis for exercising jurisdiction with respect to Bata.

3. Plaintiff filed an amended Complaint on July 24, 1996. All references to the Complaint in this Opinion and Order apply to the amended Complaint. Plaintiff has since withdrawn its RICO claim.

4. At trial, this Court found that if the Lanham Act applied to the Canadian sales, Marlboro had infringed plaintiff's Aerosoles trademark with regard to certain shoes sold through Town Shoes. This Court found no infringement by Marlboro from a single advertisement by Gredico, and no other infringements were alleged as to Gredico.

waffle sole ("Waffle Patent"); and (5) trade dress which includes a combination of the above items of intellectual property.

Aerosoles have been sold in Canada since 1987, and since 1991 the Canadian sales have totaled approximately $100 million. Aerosoles are advertised in Canada in magazines, billboards, bus shelters, and point-of-sale advertisements. On April 4, 1991, Aerogroup filed for a Canadian trademark registration for its Aerosoles Trademark, for "[f]ootwear namely women's casual shoes, comfort shoes, non-athletic shoes and fashion sneakers." The mark was registered on June 10, 1994. The Canadian trademark is the same in appearance as the American registration. Earlier, on July 31, 1990, Aerogroup registered a Canadian industrial design patent for a shoe sole with a waffle pattern. The industrial design drawings do not directly correspond to the current configuration of the waffle sole.

### C. *Marlboro*

Marlboro, which was founded in 1987, is a buying agent which arranges for the production of footwear through its agents overseas and sells it to customers in the United States and Canada. The shoe designs Marlboro presents to its customers are frequently "knock offs" of other shoe designs. Since 1994, Marlboro has engaged in an active campaign to "knock off" Aerosoles. With the exception of the sole, however, Aerogroup does not contend that any feature of its shoe designs is protectable. Instead, it has challenged through this lawsuit what it contends are the infringements of its shoe sole and its trade dress. Marlboro is responsible for the design of the sole on its Aerosoles knock offs. With respect to the trade dress for Marlboro's shoes, while customers usually choose to place their own private label names on the shoes they order from Marlboro and also choose the trade dress, such as the design for the shoe box and sock liner label for the

shoes, Marlboro designed the principal trade dress of which Aerogroup complains: the stylized use of the name Air Supply.

Marlboro has used the name Air Supply for almost a decade, usually on shoe samples, and occasionally for a shipment of shoes when a customer has chosen to order private label shoes from Marlboro using that name. From approximately 1993 to January 1996, one Marlboro customer had exclusive use of the name as its private label brand name for shoes. Aerogroup has complained of none of these prior uses.

In 1995, however, Marlboro ordered shoe boxes from its overseas agent with a design for the name Air Supply that knocked off Aerosoles' trade dress. By using Aerosoles-like trade dress to display its knock offs of Aerosoles shoes at the August 1995 Las Vegas shoe show display, Marlboro hoped to draw attention to how close its knock offs were to the original Aerosoles.[5]

In early 1996, after the customer who had had exclusive use of the name Air Supply for several years went out of business, Marlboro allowed its other customers to use the Air Supply trade dress that Marlboro had created to knock off the Aerosoles trade dress. Those customers include Town Shoes, Bata, and Weiss & Neuman, who used this trade dress on the shoe boxes and sock liners for their Aerosoles knock off shoes.

With respect to the sales to Bata, Marlboro placed orders for the shoes with a Taiwanese factory representative who arranged for the manufacture of the shoes in China. The shoes were shipped directly from China to Canada, and Marlboro was paid a commission based on the factory cost per pair of shoes, an arrangement referred to as first cost basis. When a customer buys shoes on a first cost basis it assumes all of the risks.

Marlboro asserts that it has sold Bata 50,580 pairs of shoes bearing the Air Supply logo in the trade dress which this Court

---

**5.** The Aerosoles trademark is the word "Aerosoles" in stylized capital letters with a twisting line underneath that curves back and forth three times. The entire mark is written on an angle with the right edge of the word higher than the left. Aerosoles's trade dress includes, among other things, the Aerosoles trademark, which is located on the sock liner of the shoes and on the box. The Air Supply shoes this Court found to be infringing contained the word Air Supply written in a similar script, with an irregular underlining, and placed in the same location on the shoe boxes and sock liner labels.

found infringing. The total price of these shoes—paid directly to the factory by Bata—is $485,475. Marlboro was paid a commission of $41,265.38.[6] As to Marlboro's other Canadian customers, Marlboro sold 2,166 pairs of Air Supply shoes bearing an infringing trade dress to Town Shoes, for which Town Shoes paid the factory $14,918, and paid Marlboro $1,491.80. Marlboro sold 17,889 pairs of Easy Step shoes to Gredico, for which Gredico paid the factory $121,692, and paid Marlboro $9,735.36. Aerogroup has not claimed that the trade dress associated with any of the Easy Step shoes infringed its rights. Its sole claim, which the Court rejected insofar as it was made against Marlboro at trial, related to a single magazine advertisement by Gredico.

## D. *Bata*

Bata is incorporated and has its principal place of business in Ontario, Canada. Bata has no offices, employees, property, or bank accounts in the United States. Bata is not licensed to do business in the United States and is not a member of any footwear trade associations in the United States.

The Bata entity which is a defendant in this case has two divisions, the "Retail Division" and the "Norimco Division."[7] The Retail Division, which is the one that sells the allegedly infringing shoes, operates retail shoe stores which are all located in Canada. The Retail Division has no sales agents in the United States, does not solicit sales in the United States, and earns no revenue from activities in the United States. The Retail Division has not advertised in the United States the "Air Supply" shoes at issue in this case, and has not promoted the shoes anywhere through the mass media, including newspapers, television, and radio.

Until the middle of 1995, the Retail Division bought Aerosoles shoes through Aerogroup's exclusive distributor in Canada. Aerogroup's sales to Bata in 1994 and 1995 averaged 50,000 pairs per year. Bata was "by far" the largest Canadian purchaser of shoes from Aerogroup. Bata's retail sales of Aerosoles during 1994 and 1995 were approximately $3 million per year. In early October 1995, Bata ordered an additional 5,760 pairs of shoes for the Spring 1996 season. The wholesale price of these shoes was $191,000. In January 1996, Bata cancelled all pending orders of Aerosoles shoes. During the Spring 1996 season, Aerosoles knock offs supplied by Marlboro—which are the subject of this action—first began appearing in Bata's stores.

According to Bata, some time in 1995 Aerogroup raised its prices to a level at which Bata no longer believed it could sell Aerosoles.[8] Prices were raised in June 1995 from an average of $50.00 Canadian to $80.00 Canadian. According to Bata, it attempted to sell Aerosoles at the new higher price, but was unable to do so, and therefore stopped buying from Aerogroup. In August 1995, Bata saw Marlboro's Air Supply shoes at the Las Vegas shoe show, and thereafter purchased shoes from Marlboro. Bata has nev-

---

6. Marlboro asserts that altogether it has sold Bata 60,080 pairs of Air Supply and Comfort Supply shoes, for a total price paid to the factory of $639,016, and total commission to Marlboro of $54,316.36.

In its brief, Aerogroup states that "Marlboro sales in Canada to Bata alone *were admitted to be* at least $2.0M" (emphasis added). The evidence Aerogroup cites for this proposition is a Marlboro document which states that "[t]his account keeps growing and growing. We can certainly achieve over 2 million dollars with this account *if we can provide them with timely samples*" (emphasis added). This evidence reflects a sales target, not an actual sales figure.

7. Bata's Norimco Division manufactures shoes—primarily "foul-weather" boots—and sells them to wholesalers in Canada, as well as other coun-

tries including the United States. According to Bata, about 1% of Bata's total revenue comes from Norimco's sales to customers in the United States. Bata asserts that its Norimco Division has not been involved in any way with the Retail Division's sale of Aerosoles or Air Supply shoes. The Norimco Division uses two independent sales representatives, one in Wisconsin and the other in New Hampshire, who are paid a commission and represent several other footwear manufacturers. These sales representatives have no authority to bind Norimco to transactions, and once Norimco agrees to sell the merchandise, it is sold FOB Canada.

8. Bata claims that because the Air Supply shoes sell in a lower-priced market than do Aerosoles, Aerogroup has not lost any profits due to Bata's sale of Air Supply shoes.

er sold the Air Supply shoes in the United States.[9]

In October 1995, Bata applied for a Canadian trademark registration for the Air Supply name, and that application is currently pending. Aerogroup has not filed an objection to that application. In September 1996, Bata applied for a Canadian trademark registration for the design on its Air Supply shoe soles.

In house counsel for Bata filed an affidavit indicating in conclusory terms that Aerogroup's Aerosoles Trademark is "open to serious question under Canadian trademark law" because Aerogroup did not file a "registered user notice" to appoint the Indeka Group, Aerogroup's Canadian distributor, as the mark's registered user in Canada and because the trademark has not been used in Canada in the same form in which it has been registered. In addition, the attorney states without further explanation that Aerogroup has no enforceable trademark rights in Canada in the waffle sole design. Finally, the attorney argues that Aerogroup's industrial design registration for its waffle sole is also "open to serious question" because it was not registered within one year of its first use, and also because Aerogroup has not complied with Canadian law because it has failed to stamp its waffle soles with an "RD" and other required information.

Another Canadian attorney, who filed an affidavit on behalf of Aerogroup, opined that if this Court were to enforce Aerogroup's trademark rights under United States law, it would not conflict with Canadian law. Moreover, he stated that Bata's pending registration of the name "Air Supply" would not give Bata any rights to use Air Supply in stylized lettering, which is the use for which Aerogroup is bringing this action. He states that because Bata uses a "registered" symbol with its Air Supply name, it is engaging in false advertising under Canadian law because such a designation can only be used for a registered trademark.

The attorney also gives his opinion that Bata's Air Supply logo with stylized script and a red swoosh underlining constitutes an infringement under Canadian law of the Aerosoles Canadian trademark. In addition, the lawyer opines that Canadian law and United States law are "virtually identical" with respect to whether Bata's design for the Air Supply name infringes the Aerosoles trademark. Furthermore, the lawyer states that it is his opinion that Bata's sole design violates Aerogroup's trademark rights in the Aerosoles waffle sole design. Again, the affidavit indicates that Canadian law as to the waffle sole design trademark is "virtually identical" to United States law.

Aerogroup's Canadian lawyer also disputes Bata's lawyer's conclusion that the Aerosoles Canadian trademark is invalid under the "registered user notice" requirement because Indeka is selling the shoes in Canada rather than Aerogroup. He contends that the law regarding this issue changed in 1993. Finally, he notes that the differences between the registered Aerosoles Trademark and the trademark in use are so slight as to be immaterial.

Aerogroup also submitted an affidavit from Laura D. Viola, who is identified only as "a resident of Flushing, New York." She states that on May 29, 1996, she telephoned a Bata shoe store in Canada and requested that it send her a pair of Air Supply shoes. She sent the store a check, and it mailed her the shoes in New York. The affidavit does not indicate how she learned that a Bata store in Canada carried the type of shoe she requested, what prompted her to make this request, or what her relationship is, if any, to Aerogroup. In response to this Court's inquiry, Aerogroup admitted that its counsel asked Ms. Viola to place this call.

## II. *Discussion*

### A. *Lanham Act Claims*

■ The "usual rule" is that a sale of trademark-infringing merchandise that occurs in Canada will be governed by Canadian law, not United States law. This is true because, among other reasons, principles of

9. Aerogroup asserts that several of the Bata stores—those located in Vancouver, Toronto, and Montreal—are close to the United States border, and that these stores are "most likely" frequented by U.S. residents who "obviously" shop for clothes and shoes in Canada.

international comity and the general principles of tort law—which ordinarily give jurisdiction in an infringement and unfair competition case at the place where the passing off occurs—dictate that each nation grant and control the exercise of trademark rights within its own borders. *See Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

The exercise of Lanham Act extraterritorial jurisdiction is governed by the Second Circuit's decision in *Vanity Fair Mills.* In *Vanity Fair Mills,* the Court of Appeals addressed the issue whether the Lanham Act provides relief in American courts against acts of unfair competition committed "in foreign countries by foreign nationals." *Id.* at 640. It was uncontested in *Vanity Fair Mills* that the United States court had personal jurisdiction over the foreign defendant. *Id.* at 636. The Second Circuit was guided in its analysis by the Supreme Court's decision in *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952), which addressed the extraterritorial effect of the Lanham Act on acts by a United States citizen in Mexico. In that context, the Supreme Court stressed the following factors for determining the extraterritorial effect of the Lanham Act: (1) that the defendant's conduct had a substantial effect on United States commerce; (2) that the defendant is a United States citizen and thus subject to this country's "broad power to regulate the conduct of its citizens in foreign countries"; and (3) that no conflict with trademark rights established under foreign law existed. *Vanity Fair Mills,* 234 F.2d at 642.[10]

In the Second Circuit's view, the Supreme Court's finding that there was extraterritorial effect for the statute was deeply rooted in this nation's power to control the conduct of its citizens, when it can do so without impinging on the rights "of other nations or their nationals." This being so, it opined that the absence of one of the other factors (that is, factors one or three as listed above) "might well be determinative and ... the absence of both is certainly fatal" to applying the Lanham Act to a citizen's activities abroad. *Id.* at 643.

Applying this analysis to the facts before it, the Second Circuit in *Vanity Fair Mills* refused to extend the Lanham Act to acts of a Canadian company in Canada acting under a presumably valid trademark registration in that country even where there was a substantial impact on American commerce from the defendant's activities. *Id.* at 643. As a result of this holding, the Second Circuit did not reach the issue of whether the Commerce Clause in the Constitution would permit the Lanham Act to reach acts of foreign nationals abroad that have a substantial effect on United States commerce. *Id.* at 641–42.

In two cases since *Vanity Fair Mills* the Second Circuit has had occasion to address again the extraterritorial application of the Lanham Act. In *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 746 (2d Cir.1994), the Second Circuit applied the Lanham Act to the conduct of a foreign defendant abroad only insofar as such use of the infringing mark was "likely to make [its] way to American consumers." In *Totalplan Corp. v. Colborne,* 14 F.3d 824, 830–31 (2d Cir.1994), the court declined to extend the Lanham Act to a foreign defendant's sales of goods abroad, even when those goods had been shipped through, and labelled with the allegedly infringing name in, the United States and there was no question that the court had personal jurisdiction over the defendants. Weighing against exercise of jurisdiction were the facts that the defendants were not citizens and that there was no substantial

---

**10.** Aerogroup cites *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733 (2d Cir.1994) for the proposition that this Court should not "strictly" apply these *Vanity Fair Mills* factors in this case. Aerogroup argues that it is not seeking an absolute bar against the use of the name "Air Supply" in Canada, and that therefore *Sterling Drug's* willingness to forego a "stringent" application of the *Vanity Fair Mills* test should guide this Court's analysis. *See id.* at 746. This is a misreading of *Sterling Drug.* There, the Second Circuit dealt with an injunction which was tailored only to reach the infringing uses of the mark "Bayer" which were "likely to make their way to American consumers." *Id.* Here, however, Aerogroup is concerned with use of an allegedly infringing mark in Canada—its request for an injunction is not limited to those uses in Canada likely to make their way back to the United States.

effect on United States commerce, as judged against the fact that the infringing goods had not reentered the United States to cause confusion among United States consumers and no foreign sales by the American plaintiff had been diverted. *Id.*

Discussion of only one other Second Circuit case is necessary to set the framework for the analysis which will follow. Prior to the Supreme Court's decision in *Bulova,* the Second Circuit had occasion to address the extraterritorial effect of the federal 1905 Trade–Mark Act over the activities of United States residents in selling American-manufactured goods abroad. *See George W. Luft Co. v. Zande Cosmetic Co.,* 142 F.2d 536 (2d Cir.), *cert. denied,* 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944). Since in *Bulova* the Supreme Court relied on *Luft* in analyzing the extraterritorial question presented to it, *Bulova,* 344 U.S. at 286–87, 73 S.Ct. at 255–56, it remains appropriate to consider *Luft's* teaching. *See Totalplan,* 14 F.3d at 831. In *Luft* the Second Circuit found it appropriate to enjoin defendants' activities in the United States which would result in sales in countries abroad where the plaintiff is doing business and the defendants had not established superior trademark rights under local law, but not in countries where the plaintiff was not engaged in business or where the defendants had established trademark rights. *Luft,* 142 F.2d at 540–41.

█ As this precedent indicates, the citizenship of the defendant is the most significant factor in determining whether to apply the Lanham Act extraterritorially to a defendant's foreign activities. Consequently, courts have been reluctant to extend the reach of the Lanham Act to actions of foreign defendants taken abroad. Indeed, Aerogroup cites only three cases within the Second Circuit in which subject matter jurisdiction was found over a foreign defendant, and in each of these cases the foreign defendant's activities in this country strongly supported the exercise of jurisdiction.

In *Sterling Drug,* as noted above, the injunction was restricted to conduct occurring abroad that was likely to cause a mark to be used within the United States in a way that would confuse American consumers. *Sterling Drug,* 14 F.3d at 746. In *Warnaco Inc. v. VF Corp.,* 844 F.Supp. 940 (S.D.N.Y.1994), the foreign defendant had settled a foreign lawsuit by entering into an agreement with the American plaintiff in which it agreed, among other things, to submit itself to the jurisdiction of a New York federal court. Thereafter, the plaintiff filed suit in this Court alleging that the foreign defendant had breached that agreement by taking steps that weakened the plaintiff's business in the Iberian Peninsula and caused confusion among Spanish and Portuguese consumers. The foreign defendant was a wholly owned subsidiary of the plaintiff's primary competitor, who was also named as a defendant in the New York action. *Id.* at 952. Finally, in *King v. Allied Vision, Ltd.,* 807 F.Supp. 300 (S.D.N.Y.), *aff'd in part, rev'd in part,* 976 F.2d 824 (2d Cir.1992) (finding appeal of extraterritorial injunction "without merit"), a foreign defendant obtained the foreign distribution rights to an American film which the credits alleged was based on the Stephen King short story "The Lawnmower Man." The agreement at issue, which the foreign defendant had entered through its American agent, was governed by California law. The defendants ignored King's request to remove all attribution to him: as the court found, the film was not based either wholly or substantially on his short story. The court held that the foreign defendant had sufficient contacts with the United States to support an extraterritorial injunction, relying specifically on the false attribution having occurred in the United States and the defendant's American contract. *Id.* at 307.[11]

Thus, when a plaintiff has sought to extend the Lanham Act to the foreign activities of foreign defendants, courts have scrutinized with care the nexus between the foreign defendant's activities within the United States

---

11. In reaching its conclusion the court in *King* relied on both *Vanity Fair Mills* and the Fifth Circuit's decision in *American Rice, Inc. v. Arkansas Rice Growers,* 701 F.2d 408 (5th Cir.1983), on which plaintiff also relies. *American Rice,* however, as was made clear in this Circuit's decision in *Totalplan,* contains a lower standard for exercise of extraterritorial injunctive relief than that which governs within the Second Circuit. *Totalplan,* 14 F.3d at 830.

and the conduct giving rise to the Lanham Act claims.[12] In effect, courts have analyzed whether through their actions either within the United States or that are directed at the United States it is appropriate to hold a foreign defendant to the requirements of American law. While such an analysis of contacts may appear to be similar to an analysis of personal jurisdiction, which is ultimately concerned with issues of fair play and substantial justice, *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), here the focus is on the existence of a basis to find jurisdiction to extend federal law to a foreigner's activities outside this country when issues of international comity and principles governing tort liability have traditionally restricted the reach of that law to this country's borders.

Requiring such a nexus in the case of a foreign defendant is not inconsistent with *Vanity Fair Mills*. The three-part analysis that *Vanity Fair Mills* extracted from *Bulova* was, as noted above, originally developed to analyze whether foreign sales by an American citizen were within the reach of the Lanham Act. Subsequently—and perhaps reflexively—that same test has been applied to foreign sales by non-citizen defendants. Nonetheless, courts have only applied the Lanham Act to the foreign sales of foreign defendants where special circumstances exist, wholly apart from any analysis of whether there has been a substantial effect on United States commerce or whether there is a potential conflict with foreign trademark law. Those special circumstances have included, as described above, an examination of the nexus between the foreign defendant's allegedly infringing conduct and its activities within or directed at this country.[13]

---

**12.** Outside of the Second Circuit, all but one of the cases cited by Aerogroup in which a court issued an injunction with extraterritorial effect involve (1) either entirely American defendants, or the primary defendants are American citizens or U.S. corporations, and (2) substantial conduct within the United States. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995) (noting that "[s]ome or all of the corporate defendants are United States corporations" and "[a]ll of the individual defendants are United States residents"; some of the counterfeit goods were shipped through the United States); *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179–80 (11th Cir.1994) (primary corporate defendant U.S. corporation; goods shipped through U.S. free trade zone); *Ramirez & Feraud Chili Co. v. Las Palmas Food Co.*, 146 F.Supp. 594, 589–601 (S.D.Cal.1956) (primary defendants U.S. citizens; remaining defendant a U.S. resident; counterfeit goods reentering the United States), *aff'd*, 245 F.2d 874 (9th Cir.1957), *cert. denied*, 355 U.S. 927, 78 S.Ct. 384, 2 L.Ed.2d 357 (1958).

In *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406 (9th Cir.1977), the principal defendant was a Liechtenstein corporation, and the other defendant was its U.S. subsidiary. This case is of little help to Aerogroup, however. First, the court refused to decide whether the Lanham Act applied extraterritorially under the facts before the court, and remanded the case to the district court in light of recent Ninth Circuit precedent which had not been before the district court. Second, the court declined to employ the "substantial" effects test adopted by the Second Circuit, opting for the more expansive "some" effects test, *id.* at 428, which, as already noted, has expressly been rejected by the Second Circuit. *See also Nintendo of Am., Inc. v. Aeropower*

*Co., Ltd.*, 34 F.3d 246, 251 (4th Cir.1994) (vacating injunction against foreign defendant's conduct abroad that had a significant impact on United States commerce for failure to consider, *inter alia*, the defendant's citizenship).

**13.** The analysis described here is similar to the Second Circuit's "conduct" test for analyzing the extraterritorial jurisdiction of the securities laws, which like the Lanham Act are silent on the issue of extraterritorial reach.

Under the conduct test, a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, ... and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses....

*Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 122 (2d Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 702, 133 L.Ed.2d 659 (1996). The securities laws, however, allow for jurisdiction to be found over activities under either a conduct test or an effects test, although a "combination of the two often gives a better picture of whether there is sufficient United States involvement to justify exercise of jurisdiction by an American court." *Id. See also North South Finance Corp. v. Al-Turki*, 100 F.3d 1046 (2d Cir.1996) (discussing extraterritorial reach of the securities and antitrust laws in the course of the "delicate" task of deciding the extraterritorial reach of the RICO statute); *Sterling Drug*, 14 F.3d at 746–47 (international comity of greater concern in the extraterritorial application of the Lanham Act than of antitrust laws).

Turning to the prong of *Vanity Fair Mills* which requires a finding of substantial effect on United States commerce, the Second Circuit has recently reaffirmed that there must be a "substantial" effect—not merely "some" effect. *See Totalplan Corp.*, 14 F.3d at 830; *Sterling Drug*, 14 F.3d at 746. *See also United States v. Lopez*, 514 U.S. 549, ——– ——, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995) (Congress' commerce authority includes the power to regulate those activities having a "substantial" effect on interstate commerce.).[14] Since a primary goal of the Lanham Act is the protection of American consumers against confusion, a substantial effect on commerce may be found where the foreign activities create confusion among United States customers as to the source of products sold in the United States, *Sterling Drug*, 14 F.3d at 747, or where infringing goods reenter the United States. *Bulova*, 344 U.S. at 286, 73 S.Ct. at 255–56. Courts must be careful, however, not to find a substantial effect from relatively minor interferences with United States commerce. As the Second Circuit cautioned:

> In today's global economy, where a foreign TV advertisement might be available by satellite to U.S. households, not every activity of a foreign corporation with any tendency to create some confusion among American consumers can be prohibited by the extraterritorial reach of a District Court's injunction.

*Sterling Drug*, 14 F.3d at 747. Courts in this district have also found a substantial effect on commerce where an American plaintiff's foreign sales have been diverted, *see, e.g., Warnaco*, 844 F.Supp. at 951 (loss of over $6 million in sales); and where there is danger of irreparable injury to a plaintiff's good will and reputation. *Warnaco*, 844 F.Supp. at 945, 951; *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F.Supp. 78, 80 (S.D.N.Y.1989) (threatened sale of inferior goods bearing Calvin Klein label).

The third *Vanity Fair Mills* factor, whether there is a conflict with foreign trademark rights, is related to the international law and conflicts of law doctrines of comity. Courts in the United States should avoid deciding cases where "the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country." *Vanity Fair Mills*, 234 F.2d at 647.

One method by which a conflict with foreign trademark law may be found—as was the case in *Vanity Fair Mills*—is where the defendant is operating under a presumptively valid trademark in its home country. Where appropriate, even a pending application for a trademark is sufficient to find the existence of rights under foreign law. In *American White Cross Labs., Inc. v. H.M. Cote, Inc.*, 556 F.Supp. 753 (S.D.N.Y.1983), the defendant had applied for a trademark in Canada, the plaintiff had not filed an objection, and the Canadian authorities had previously rejected an earlier objection by plaintiff to another application similar to plaintiff's mark. *Id.* at 757–58. Under these circumstances, the court found that the fact that the defendant had merely applied for a trademark was sufficient to satisfy this prong of the *Vanity Fair Mills* test. *Id.* On the other hand, in *Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563, 567–68 (S.D.N.Y.1996), the court found no conflict with Japanese law where an expert's uncontradicted testimony indicated that a mere application affords no protection in Japan and that because plaintiff's mark was the first to be used, defendant's application, which was being challenged, was unlikely to be granted.

### 1. *Marlboro*

■ Plaintiff seeks to enjoin the activities of Marlboro that have led to sales of infringing shoes in Canada and to obtain damages from Marlboro for those sales. Since Marlboro is a United States citizen, this Court possesses considerable authority to regulate any foreign activities in which Marlboro may engage. In this regard, it is significant that Marlboro's activities are conducted almost exclusively in the United States and that it

---

**14.** As noted above, the Second Circuit's requirement of a "substantial" effect on United States commerce distinguishes cases such as the Fifth Circuit's decision in *American Rice*, which only require "some" effect. *See Totalplan*, 14 F.3d at 830 (rejecting *American Rice's* "some" effect on commerce test, and confirming "substantial" effect test).

engaged in the same infringing activities in the United States regardless of whether its customers were American or Canadian. It solicited these customers at shoe shows in the United States, used the same factories for the manufacturing of the shoes, offered its American and Canadian customers the same shoe styles, and was paid by both American and Canadian customers on a commission basis. Marlboro solicited sales of its Aerosoles knock offs by praising the high quality of the knock offs—that is, their ability to confuse customers. Accordingly, this selling point worked to Marlboro's advantage wherever in the world Aerosoles are sold—including Canada. From Marlboro's perspective, it was blind to national borders, and used the same methods and the same systems of operation to sell shoes and infringe Aerogroup's trademark rights in both Canada and the United States.

The evidence regarding any substantial effect on United States commerce is equivocal. Aerogroup argues that its foreign sales have been diverted. Marlboro's activities have resulted in purchases in Canada of over $500,-000 worth of shoes which have been sold with a trade dress that would have infringed Aerogroup's intellectual property rights if used in the United States. Aerogroup lost its largest Canadian customer, who had $3,000,-000 worth of retail sales of Aerosoles per year and who cancelled $191,000 worth of orders of Aerosoles and replaced the order with Marlboro knock offs. While these figures are not *de minimis,* they do not approach the multimillion dollar figure of diverted sales in *Warnaco.* I am prepared to find, however, that the extent of Bata's infringing sales would have been much greater but for Aerogroup's prompt action in filing this lawsuit.

Marlboro argues that the plaintiff's sales were not diverted through the sales of Air Supply knock offs since Aerosoles are sold in a different market. While the Aerosoles and Air Supply shoes are sold in different submarkets and are not in direct competition with each other, they are in the same broad market and are in sufficiently competing markets to support a finding of trademark infringement under American law. Nonethe-

less, there is evidence that Aerogroup lost its largest Canadian customer because it had raised its prices, and not solely or even principally because Marlboro had entered the market with an infringing trade dress for its Aerosoles knock offs.

Turning to Aerogroup's contention that Marlboro's activities injured its reputation, this issue is complicated by Aerogroup's practice of knocking off the Aerosoles design and trade dress for its own private label customers, as described in the Court's Opinion of October 21, 1996. To the extent Aerogroup followed this practice in Canada, it undercuts any claim of injury by others to its reputation. Finally, there is no evidence that American consumers have been the targets of the alleged misuse in Canada of the Aerosoles trade dress.

On balance, I find that the effect on American commerce is substantial. In making this finding, I rely in significant part on the fact that Marlboro conducted its business almost exclusively within the United States and used the instrumentalities of American commerce to profit at Aerogroup's expense without regard to where the sales of shoes ultimately occurred or whether those sales violated American law.

As for the existence of any conflict with Canadian trademark law, Marlboro concedes that it has not filed for registration of the Air Supply trademark in Canada. Rather, Bata has filed the application. In any event, even if Marlboro could piggyback on Bata's rights, as will be discussed below, this factor does not clearly weigh either way in my ultimate determination.

In sum, I hold that the Lanham Act applies extraterritorially to Marlboro's sales in Canada. Consequently, the terms of the November 15 Injunction are extended to cover Marlboro's infringing actions which take place in Canada. Moreover, damages will be assessed against Marlboro for those sales of Air Supply shoes to Bata and Town Shoes that have been found to bear a trade dress that infringes Aerogroup's rights under the Lanham Act.

### 2. *Bata*

■ It is not disputed that Bata is a citizen of Canada. It has no offices in the United States and its contacts with the United States are sufficiently tenuous that finding personal jurisdiction would appear to be at the very least a complicated enterprise.

Aerogroup argues that this Court should ignore Bata's foreign citizenship since the principal defendants in this action are United States citizens. This argument might be persuasive if Bata were related to one of the other corporate defendants. It is not.

Insofar as the shoes at issue here are concerned, Bata's contacts with the United States are limited to attending trade shows in the United States and placing its orders for the shoes through Marlboro, an American company. The shoes themselves were manufactured abroad, shipped directly to Canada, and sold exclusively in Canada.[15] Placing orders through an American company for foreign manufactured goods which, for the sake of this analysis, are presumed to compete abroad with the goods of another American company does not establish a sufficient nexus to allow this Court to extend the reach of the Lanham Act to the foreign company's foreign sales.

Moreover, as noted above in connection with the discussion of Marlboro, the evidence regarding any substantial effect that Bata's sales have on United States commerce is equivocal unless one can consider the additional facts that were present in the case of Marlboro.[16] There are no such additional pertinent facts to tip the scales against Bata, though. I cannot find, therefore, that Bata's sales have had a substantial effect on United States commerce.[17]

Turning to the issue of any conflict with Canadian law, Aerogroup has registered its Aerosoles Trademark in Canada and Bata has applied for registration of the name Air Supply, although not in the form that imitates the Aerosoles Trademark. Bata has raised issues about the enforceability of the Aerosoles Trademark. Applying the analysis in *Luft,* this case is not one in which the plaintiff has clearly established superior rights abroad in its trademark. The affidavits on foreign law presented by the parties are largely conclusory and do not provide significant guidance to this Court. While the questions in this area are not sufficient by themselves to deny Aerogroup the protections of the Lanham Act in an action against Bata, they are sufficient to increase this Court's caution in exercising jurisdiction over matters more appropriately left to Canadian courts. Accordingly, there is no subject matter jurisdiction as to Aerogroup's Lanham Act claims against Bata.

### B. *Patent Claims*

■ Bata also challenges subject matter jurisdiction with respect to Aerogroup's patent claims, noting that 35 U.S.C. § 271(a) by its terms refers to selling a patented invention "within the United States." Aerogroup does not challenge this interpretation of Section 271(a), but rather cites without significant discussion 35 U.S.C. § 271(f)(1) in support of the extraterritorial reach of its patent claims. Section 271(f)(1) states that:

> Whosoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively

---

**15.** This Court ignores, as it must, the attempt by Aerogroup's counsel to manufacture jurisdiction by arranging for a New Yorker to order a pair of shoes from Bata. There is no evidence that Bata itself has taken any steps to solicit business from American consumers.

**16.** Since almost all of Marlboro's Canadian sales of shoes with an infringing trade dress are sales to Bata, the analysis of the substantial effect of such sales on American commerce must be the same except to the extent there are relevant facts unique to either defendant.

**17.** Aerogroup argues that all of the actions of Marlboro of which plaintiff complains are attributable to Bata for jurisdictional purposes. It is simple agency law that the principal is only liable for the actions of its agent when those actions are within the scope of the agency relationship and for the benefit of the principal. All of Marlboro's actions with respect to all of the shoes sold in this case—such as those shoes sold by other defendants in the United States—are not attributable to Bata because these actions were not undertaken within the scope of the agency relationship between Marlboro and Bata and they were not for the benefit of Bata.

induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(1). This is a frivolous argument. First, the language of this section by its terms does not apply to the patent at issue here, which has no "component parts" but is rather a design patent for a shoe sole. Second, Aerogroup nowhere alleges that any of the allegedly infringing waffle soles—or any component thereof—were supplied from the United States. In fact, it is uncontested that the shoes at issue in this case were manufactured entirely in China. Indeed, at least one court in this District has suggested that Section 271(f)(1) requires that the components be manufactured or assembled in the United States. *See Windsurfing Int'l, Inc. v. Fred Ostermann GmbH*, 668 F.Supp. 812, 820–21 (S.D.N.Y.1987), *aff'd*, 1 F.3d 1214 (Fed.Cir. 1993). Finally, if this Court were to give such a broad interpretation to Section 271(f)(1), that would read out of existence Section 271(a)'s textual limitation to infringing sales within the United States. Rather than a blanket change in Section 271(a)'s narrow, territorial reach, Section 271(f)(1) is a specific and targeted exception to the fact that the patent protection generally extends only within the United States. Accordingly, there is no subject matter jurisdiction as to the patent claims to the extent they encompass violations of the patent outside of the United States.

### III. *Conclusion*

In sum, I find that there is no subject matter jurisdiction for either the Lanham Act or Patent Act claims against Bata, and therefore, dismiss the action as to Bata. As to Marlboro's actions in Canada, I find that there is subject matter jurisdiction for the Lanham Act claims but not the patent law claims. This Court's Opinion of October 21, 1996 and Order of November 15, 1996 are modified accordingly.

SO ORDERED.