**GUCCI AMERICA, INC., Plaintiff,**

v.

**GUESS?, INC., et al., Defendants.**

**No. 09 Civ. 4373(SAS)(JLC).**

United States District Court,
S.D. New York.

May 25, 2011.

Louis Sherman Ederer, Matthew Thomas Salzmann, Arnold & Porter, LLP, New York, NY, for Plaintiff.

Andrew Jay Frackman, O'Melveny & Myers LLP, Darren Wayne Saunders, Hiscock & Barclay, LLP, Kristin Marie Darr, Steptoe & Johnson, LLP, Atul R. Singh, Darby & Darby, P.C., New York, NY, Daniel M. Petrocelli, Robert Craig Welsh, O'Melveny & Myers, LLP, Michael R. Heimbold, Steptoe & Johnson, LLP, Los Angeles, CA, Alpa V. Patel, Hiscock & Barclay, LLP, Rochester, NY, John T. Williams, Hinkhouse Williams Walsh LLP, Chicago, IL, Abigail Anne Rubinstein, Steptoe & Johnson, LLP, Washington, DC, Paul Fields, Leason Ellis LLP, White Plains, NY, for Defendants.

## MEMORANDUM AND ORDER

JAMES L. COTT, United States Magistrate Judge.

In this trademark infringement action, Plaintiff Gucci America, Inc. ("Gucci") seeks permission to move for a court order pursuant to Rule 37 of the Federal Rules of Civil Procedure compelling Defendants to produce foreign sales information relating to the allegedly infringing products involved in the litigation. On May 2, 2011, this issue was referred to me by United States District Judge Shira A. Scheindlin. (Dkt. No. 148). Prior to the referral, the parties had submitted letters to Judge Scheindlin and appeared before her for a pre-motion conference on April 22, 2011. At Judge Scheindlin's direction, Gucci made an evidentiary submission on April 29, 2011 in support of its application. For the reasons set forth below, I deny Gucci's request.

## I. BACKGROUND

Gucci commenced this action on May 6, 2009 against Defendant Guess?, Inc. ("Guess"), asserting trademark infringement and related claims arising out of its use of certain trademarks, logos, and designs. (Dkt. No. 1). Gucci has twice amended its Complaint, adding Defendants Marc Fisher Footwear LLC ("Marc Fisher"), The Max Leather Group/Cipriani Ac-

cessories, Inc. ("Max Leather"), Signal Products, Inc. ("Signal"), Sequel AG ("Sequel"), K & M Associates L.P. ("K & M"), Viva Optique, Inc. ("Viva"), and Swank, Inc. ("Swank") (collectively, "Defendants"). (Dkt.Nos.19, 101). At issue in this case are five of Gucci's registered trademarks: the "green-red-green stripe design mark," the "repeating interlocking GG design mark," the "interlocking GG design mark," the "stylized G design mark," and the "script Gucci design mark." (Second Amended Complaint ¶¶ 14, 19, 24, 29, 34).[1]

Document discovery commenced in August 2009. (Plaintiff's Apr. 5, 2011 Letter ("Pl. Apr. 5 Letter") at 1). After multiple extensions, the deadline for fact discovery expired on March 15, 2011. (Dkt. No. 132). In a letter dated April 5, 2011, three weeks after the close of fact discovery, Gucci requested a pre-motion conference in anticipation of a motion pursuant to Rule 37 "for an order compelling Defendants to immediately produce in discovery all sales and cost information relating to each and every allegedly infringing product." (Pl. Apr. 5 Letter at 3). The issue Gucci has presented to the Court is "whether, and to what extent, Defendants should be required to produce evidence of sales and cost information relating to sales generated and royalties paid in the United States, where the goods ended up in the hands of customers outside the country." (Id. at 1). Gucci's principal argument in support of its request is that, for purposes of discovery, Defendants' sales to foreign purchasers fall within the scope of the Lanham Act because they have a substantial effect on United States commerce.

Guess and certain of the licensee Defendants responded by letter on April 8, 2011.

(See Defendants' Apr. 8, 2011 Letter ("Def. Apr. 8 Letter")). Marc Fisher, another Guess licensee, responded separately by letter the same day. (See "Fisher Letter"). Defendants argue as a threshold matter that Gucci's request is untimely because it comes after the close of fact discovery in the case, and to require them to produce the requested financial information now would present a "tremendous burden on them and their foreign affiliates." (Def. Apr. 8 Letter at 3). In addition, Defendants contend that their allegedly infringing conduct abroad does not meet the standard in the Second Circuit for allowing extraterritorial application of the Lanham Act.

## II. DISCUSSION

### A. Timeliness of Gucci's Request

#### 1. Legal Standard

■■■ "A district court has wide latitude to determine the scope of discovery." *In re Agent Orange Prod. Liability Litig.*, 517 F.3d 76, 103 (2d Cir.2008); see also *S.E.C. v. Rajaratnam*, 622 F.3d 159, 180–81 (2d Cir.2010) (discussing discretion of district court to manage discovery). Under Rule 16(b), district courts are required to enter scheduling orders "that limit the parties' time to complete discovery." *McKay v. Triborough Bridge & Tunnel Auth.*, No. 05 Civ. 8936(RJS), 2007 WL 3275918, at *1 (S.D.N.Y. Nov. 5, 2007). Reopening discovery after the discovery period has closed requires a showing of good cause. *Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir.1991). Though Rule 37 does not establish time limits for such a motion, a party seeking to file a motion to compel after discovery has closed must similarly establish good cause. See, e.g.,

---

**1.** On May 5, 2009, Guccio Gucci S.p.A., an Italian affiliate of Gucci, sued Guess and its Italian affiliate in Milan for trademark infringement and related claims concerning the same trademarks that are the subject of this litigation. Gucci does not address whether the foreign sales information sought here will be produced in the Italian litigation.

*Eng–Hatcher v. Sprint Nextel Corp.*, No. 07 Civ. 7350(BSJ)(KNF), 2008 WL 4104015, at *3 (S.D.N.Y. Aug. 28, 2008). Where a party is aware of the existence of documents or other information before the close of discovery and propounds requests after the deadline has passed, those requests should be denied. *See, e.g., Slomiak v. Bear Sterns & Co.*, No. 83 Civ. 1542(CSH), 1985 WL 410, at *1 (S.D.N.Y. Mar. 12, 1985) (denying motion to compel deposition testimony where counsel knew of the witnesses and the need for testimony before the discovery deadline); *see also Pretty v. Prudential Ins. Co. of Am.*, 696 F.Supp.2d 170, 178 (D.Conn.2010); *In re Health Mgmt., Inc.*, No. 96 Civ. 0889(ADS), 1999 WL 33594132, at *5 (E.D.N.Y. Sept. 25, 1999).

■ Under the Federal Rules of Civil Procedure, discovery is permitted "regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Discoverability is determined by the broad standard of relevance. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) (relevance standard is broad in order "to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case"). The broad standard of relevance, however, is not a license for unrestricted discovery. The Federal Rules allow courts to limit the extent of discovery in certain situations, including, for example, where "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action" or where the "burden or expense of the proposed discovery outweighs its likely benefit." Fed.R.Civ.P. 26(b)(2)(C)(ii), (iii). *See Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936(KMW), 2011 WL 781198, at *2 (S.D.N.Y. Mar.4, 2011).

## 2. *Gucci's Request is Untimely*

■ Fact discovery in this case closed after several extensions on March 15, 2011. (Dkt. No. 132). Gucci's document requests were served in August 2009, more than 18 months ago. (Pl. Apr. 5 Letter at 1). Defendants served responses and objections to those requests in September and October 2009. (Def. Apr. 8 Letter at 2; Fisher Letter at 1). Gucci's request to file a motion to compel was not submitted to the Court until April 5, 2011.

Gucci has attempted to explain its delay in making this request for additional discovery. At the pre-motion conference, its counsel stated that Gucci's request for information on sales to foreign purchasers is consistent with Gucci's prior document requests for domestic sales information. (Transcript of April 22, 2011 Proceedings ("Apr. 22 Tr.") 12:19–22 ("[T]hey're foreign sales to the extent that the customer is a foreign customer, but they're U.S. sales because the sales were generated, booked, paid for, promoted, [and] marketed here[.]")). According to its counsel, Gucci came to realize the nature of Defendants' sales to foreign purchasers only late during the discovery process. Recognizing that produced sales information may not have included "sales generated and royalties received in the United States, regardless of the goods' final destination," Gucci's counsel then raised the issue with Defendants' counsel on February 1. (Pl. Apr. 5 Letter at 1–2). Gucci explained that counsel for both parties exchanged letters on the issue between February 1 and April 5. (Apr. 22 Tr. 13:25–14:12). Gucci asserted that it did not know Defendants' final position—that they refused to produce information on sales of allegedly infringing products made to foreign purchasers—until early April, after which it "immediately"

raised the issue with the Court. (Apr. 22 Tr. 14:10).[2]

The Court is not persuaded by Gucci's arguments. Defendants' position on the issue of foreign sales was made clear early and often. In September 2009, Defendants objected generally to Gucci's definition of "Accused Products" "to the extent this definition purports to include products that were sold, offered for sale, or distributed outside of the United States." (Def. Apr. 8 Letter at 2; Fisher Letter at 1).[3] Gucci never challenged those objections in an application to the Court. In addition, Defendants' production of financial information throughout 2010 made clear that the information related only to sales to domestic customers. (Def. Apr. 8 Letter at 2). Nothing in the record establishes that Gucci took issue with those productions, though Gucci was plainly on notice as to Defendants' position on foreign sales information.

Moreover, it is hard to believe that Gucci needed more than one year of discovery to piece together the nature of Defendants' foreign sales activity. Many of the documents that Gucci has submitted in support of its request were made available well before the March 15, 2011 fact discovery deadline. For example, of the 14 excerpts from depositions of Defendants' executives offered to the Court as part of Gucci's evidentiary submission, 11 were taken in 2010. Gucci also draws support for its

request from information printed out from Defendants' websites relating to retail operations, showrooms, and leadership. This is public information, and was available to Gucci long before the discovery deadline.

The Court is also cognizant of the burden that the production of foreign sales information would apparently place on Defendants. In responding to Gucci's request, Guess represents to the Court that it, its licensee defendants, and their foreign affiliates would be required to "manually compile lists of potentially hundreds or thousands of product styles, and then conduct lengthy financial analyses to determine the necessary sales and costs information." (Def. Apr. 8 Letter at 3; *see also* Fisher Letter at 3 (burden to locate and produce requested information would be "extraordinary")).These burdens are significant, especially as the parties have moved on to expert discovery consistent with the Court's revised schedule. (Dkt. Nos. 132, 143). Gucci does not dispute—or even address—the task Defendants contend they would face were fact discovery to be reopened for these purposes. The anticipated burden on Defendants would also likely outweigh the benefits of additional discovery, as Gucci has failed to demonstrate that additional discovery will establish that Defendants' foreign activities fall within the scope of the Lanham Act. *See infra* Section B. Furthermore,

---

**2.** Marc Fisher, unlike Guess, made its position known to Gucci on February 15, thus giving Gucci one month to seek relief from the Court. (*See* Fisher Letter at 2). While Gucci may have wanted to resolve the issue globally, that is, as to all Defendants, it delayed at its peril, since the Court had made clear there would be no further extensions of the March 15 date. (*See* Order dated Dec. 23, 2010 (Dkt. No. 132)).

**3.** Counsel for Marc Fisher also notes that during Gucci's deposition of Marc Fisher's CFO—a deposition Gucci excerpts in its evi-

dentiary submission at Tab 20 for the proposition that Marc Fisher's international sales operation is conducted out of its Connecticut offices—the witness was questioned regarding royalty reports and why certain material had been redacted. The CFO responded that "the redacted, non-responsive information on that would have been regarding the sales that were made outside the U.S." (Fisher Letter at 1). Gucci never challenged these redactions, even though the deposition took place more than a year ago.

reopening fact discovery at this time will cause undue delay.

Gucci knew of its need for information on sales to foreign purchasers well before the fact discovery deadline. Gucci had "ample opportunity to obtain the information" during the fact discovery period, and failed to raise the issue with the Court at the appropriate time. Fed.R.Civ.P. 26(b)(2)(c)(ii). Now, having made an untimely application, Gucci has made a request to reopen fact discovery that presents a burden on Defendants not likely to be outweighed by the benefits of additional discovery, and that does not meet the good cause requirement. Gucci's request to move for a court order to compel production of all sales and cost information for each allegedly infringing product is therefore denied as untimely.

## B. Extraterritorial Application of the Lanham Act

### 1. *Legal Standard*

■ In addition to finding Gucci's request untimely, the Court also concludes that additional discovery is not likely to demonstrate that the Lanham Act applies to Defendants' foreign activities. The Lanham Act, upon which Gucci bases its claims for relief, "confers broad jurisdictional powers upon the courts of the United States." *Steele v. Bulova Watch Co.,* 344 U.S. 280, 283, 73 S.Ct. 252, 97 L.Ed. 319 (1952). The Act has been read to reach infringing conduct abroad "when necessary to prevent harm to commerce in the United States." *Atl. Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998).

The United States Supreme Court first addressed the extraterritorial application of the Act in *Steele v. Bulova Watch Co.,* where it found that the manufacture and sale of fake "Bulova" watches in Mexico fell within the scope of the Lanham Act.

The Court allowed the extraterritorial application of the Act because Steele's "operations and their effects were not confined within the territorial limits of a foreign nation." *Bulova,* 344 U.S. at 286, 73 S.Ct. 252. While Steele's operations took place primarily in Mexico, he had purchased watch component parts in the United States, which the Court deemed an "essential step[ ] in the course of ... an unlawful scheme." *Id.* at 287, 73 S.Ct. 252. Moreover, there was evidence of Steele's competing goods resulting in consumer confusion. The fake "Bulova" watches had filtered through the Mexican border into the United States, and Bulova received complaints from jewelers in the Mexican border area whose customers brought fake "Bulova" watches in for repair. *Id.* at 285–86, 73 S.Ct. 252.

■ Four years later, the Second Circuit in following *Bulova* set forth three factors to consider in determining whether the Lanham Act can reach infringing activity that takes place abroad; (1) whether the defendant is a United States citizen; (2) whether there is a conflict between the plaintiff's trademark rights in the United States and the defendant's trademark rights under foreign law; and (3) whether the defendant's conduct has a "substantial effect on United States commerce." *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 642 (2d Cir.1956). *See also Atl. Richfield Co.,* 150 F.3d at 192. The Circuit in *Vanity Fair* stated that "the absence of one of the [first two] factors might well be determinative and that the absence of both is certainly fatal." 234 F.2d at 643. Though that decision did not establish whether the presence of the first two factors is sufficient to permit extraterritorial application of the Lanham Act, the Second Circuit later explained that it had "never applied the Lanham Act to extraterritorial conduct absent a substantial effect on

United States commerce." *Atl. Richfield Co.,* 150 F.3d at 192 n. 4.

█ It is well-settled that a showing of consumer confusion or harm to plaintiff's goodwill in the United States is sufficient to demonstrate a "substantial effect on United States commerce." *See, e.g., Bulova,* 344 U.S. at 286, 73 S.Ct. 252 (upholding extraterritorial application of Lanham Act because "competing goods could well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad"); *Atl. Richfield Co.,* 150 F.3d at 192 (citing absence of "evidence that domestic consumers have been misled or have come to view the [ ] mark less favorably as a result of [the] foreign activities" in declining to find substantial effect on United States commerce); *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1005–07 (2d Cir.1997) (affirming extraterritorial injunction under the Lanham Act because importation of infringing goods that created a likelihood of confusion had a "substantial impact" on United States commerce); *see also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 126 F.Supp.2d 328, 340 (S.D.N.Y.2001) ("[W]here the likelihood of consumer confusion or harm to a protected plaintiff's reputation is great, the substantial effect test has been satisfied.").

The Second Circuit has also considered evidence of diverted foreign sales to determine whether infringing activity abroad has had a substantial effect on United States commerce. In finding that the packaging and shipment of infringing goods from the United States to Japan did not constitute a substantial effect, for example, the Circuit noted the absence of evidence that the infringing goods re-entered the United States and caused confusion, or evidence that foreign sales were diverted on account of those shipments.

*See Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 830–31 (2d Cir.1994).

It is less clear whether a defendant's domestic commercial activity can support a finding of substantial effect on United States commerce. In *Bulova,* the Supreme Court labeled the defendant's domestic activity—the purchase of component parts from the United States—as "essential steps" in the course of the defendant's infringement. The Court stopped short, however, of stating that it was using that domestic activity as the jurisdictional predicate for its extraterritorial application of the Lanham Act. *See Bulova,* 344 U.S. at 286–87, 73 S.Ct. 252. Indeed, the Second Circuit confirmed that interpretation in *Atlantic Richfield,* where it stated that "*Bulova* does not hold that a defendant's domestic activity, even if 'essential' to infringing activity abroad, is alone sufficient to cause a substantial effect on United States commerce." 150 F.3d at 193. The Court then observed that "even if *Bulova* is read to indicate that a defendant's infringing extraterritorial conduct has a substantial effect on United States commerce whenever some non-infringing domestic activity is 'essential' to that extraterritorial conduct," none of the defendant's activities were "essential" to its foreign conduct. *Id.*

Some courts in this District have interpreted the apparent ambiguity in these statements—one asserting that "essential" domestic conduct cannot by itself constitute "substantial effect," and the other stating that it can—as evidence that the Second Circuit intended to leave open the possibility that domestic activities that materially support the foreign use of a mark can constitute a substantial effect on United States commerce. *See, e.g., Rodgers v. Wright,* 544 F.Supp.2d 302, 314–15 (S.D.N.Y.2008) (finding substantial effect where defendants, two singers who per-

formed around the world, materially advanced foreign infringement by directing their enterprise from the United States, including advertising their performances on their own website and on websites of American promoters and talent agencies); *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 171 (S.D.N.Y.1998) (applying Lanham Act and denying motion to dismiss where defendants used physical stream of American commerce to support foreign infringement by sending promotional materials and inviting prospective purchasers to U.S. showrooms to view, negotiate for, and purchase Calvin Klein jeans for international distribution).

■ Notwithstanding these interpretations, the controlling rule remains the one articulated in *Atlantic Richfield.* A defendant's domestic activity, even if "essential" to allegedly infringing activity abroad, is insufficient by itself to constitute a substantial effect on United States commerce. *Atl. Richfield,* 150 F.3d at 193. This finding is not obviated by the Court's exposition on whether the defendant's non-infringing domestic activity is "essential" to its infringing activities abroad. *See id.* "[T]here is no precedent for the view that domestic activities 'essential' to infringement abroad are enough to satisfy the 'substantial effect on U.S. commerce' test." *Procter & Gamble Co. v. Colgate–Palmolive Co.,* No. 96 Civ. 9123(RPP), 1998 WL 788802, at *68 n. 31 (S.D.N.Y. Nov. 9, 1998), *aff'd,* 199 F.3d 74 (2d Cir.1999); *see also Piccoli,* 19 F.Supp.2d at 171 ("not clear ... whether [the Second Circuit follows] this second line of cases—those finding a substantial effect on United States commerce on the basis of domestic conduct related to or supportive of deceptive actions abroad").

### 2. *The Lanham Act Does Not Apply to Defendants' Foreign Activities*

During the April 22 conference, Judge Scheindlin agreed to take a supplemental submission from Gucci to demonstrate Defendants' conduct with respect to foreign customers. (Apr. 22 Tr. 22:10–12).[4] On April 29, Gucci submitted more than 25 documents in support of its application. With respect to Guess, Gucci alleges that "all of Guess' Canadian e-commerce and retail sales are generated and processed in the United States and have a substantial impact on United States Commerce." (Plaintiff's April 29, 2011 Evidentiary Submission ("Pl. Apr. 29 Submission") at 1). In support, Gucci submits an excerpt from the deposition of Guess' Vice President and CFO of its Retail Division, along with information on the number of Guess stores in Canada and a statement from Guess' website that products are shipped from its U.S. warehouses to Canada. (*Id.* at Tabs 1, 2, 3).

With respect to the licensee defendants—Signal, Swank, Max Leather, and Marc Fisher—Gucci alleges that they "solicit, process and ship Guess-branded products to foreign purchasers." (*Id.* at 2). To support its argument, Gucci has submitted Trademark License Agreements between Guess? Licensing, Inc. and each of the four licensees, as well as excerpts of deposition transcripts, to demonstrate that the Agreements are governed by United States law, grant worldwide licensing rights, and require Guess to review and approve designs prior to sale. (*Id.* at Tabs 4, 5, 6, 10, 11, 12, 21, 22, 25, 26). Gucci also presents evidence to show that each licensee is required to maintain a show-

---

**4.** Judge Scheindlin did not permit Defendants to respond to Gucci's submission in the first instance, indicating that Guess could make a request after it received Gucci's submission. Guess has not made a request to make a further submission. (Apr. 22 Tr. 29:10–14).

room in the United States. (*Id.* at Tabs 4, 5, 7, 8, 10, 11, 12, 13, 14, 21, 22, 25, 26, 27).

Next, Gucci highlights a clause in the Trademark License Agreements as evidence that "all royalty payments on [a licensee's] worldwide sale of Guess-branded products are paid to Guess in the United States." (*Id.* at 4, 8, 11, 14 and Tabs 4, 10, 21, 25, 26). Gucci has also submitted excerpts from documents obtained in discovery, as well as publicly-available materials, to demonstrate that certain operations and decision-making for international sales take place in the United States. (*Id.* at 5, 9, 19, 20, 23, 24, 27). Lastly, Gucci asserts that Marc Fisher presents fashion shows every year in connection with the Fashion Footwear Association of New York. (*Id.* at Tabs 12, 15, 16, 17, 18).

■ Having considered Gucci's supplemental submission, I conclude that Gucci has not established that additional discovery will yield documents or other information showing that Defendants' activities have a substantial effect on United States commerce. Leaving aside the timing of Gucci's request, Gucci's evidentiary submission does not demonstrate conduct by Defendants that constitutes a "substantial effect on United States commerce" under *Vanity Fair* and *Atlantic Richfield.* While Defendants may, to varying degrees, support their foreign activities from within the United States, to hold that such support is sufficient to apply the Lanham Act extraterritorially would be inconsistent with the applicable legal standards.

As an initial matter, none of the documents Gucci offers appear to relate to products that contain the marks at issue. Despite an extensive period of fact discovery, Gucci is unable to provide documents demonstrating any connection between its marks and Defendants' foreign activities, or even that products with the marks at issue were sold to foreign purchasers.

Moreover, Gucci has not submitted any documents to suggest that consumers have been misled. *See Procter & Gamble,* 1998 WL 788802, at *68 (declining to find a substantial effect on United States commerce given absence of any evidence demonstrating confusion from airing of toothpaste commercial in China). There is no evidence that the allegedly infringing products were offered to purchasers abroad, or that those products sold to foreign purchasers re-entered the United States to cause confusion. Further, Gucci has not offered any evidence that consumers in the United States have come to view the marks in question less favorably because of Defendants' sale to foreign purchasers. *See Bulova,* 344 U.S. at 286, 73 S.Ct. 252 ("[Defendant's] competing goods would well reflect adversely on Bulova Watch Company's trade reputation in markets cultivated by advertising here as well as abroad."); *Space Imaging Europe, Ltd. v. Space Imaging L.P.,* No. 98 Civ. 2291(DC), 1999 WL 511759, at *4 (S.D.N.Y. July 19, 1999) (declining to find a substantial effect on United States commerce where alleged harm was suffered with respect to party's regional affiliate in Greece). Gucci has similarly failed to provide any documents demonstrating a diversion of foreign sales. *See Totalplan,* 14 F.3d at 830–31.

Gucci argues that one measure of harm to a plaintiff's goodwill is if the "infringing goods are seen by American tourists traveling in a foreign country, or where the goods end up in close geographic proximity to the U.S. ... and are sold to United States citizens crossing over into those countries, or can easily find their way back into the United States." (Pl. Apr. 5 Letter at 2). This argument fails for two reasons. First, Gucci relies on caselaw that is not controlling, including cases from the First and Ninth Circuits and an unpublished

Order from the Northern District of Indiana. *See Dwyer Instruments, Inc. v. Sensocon, Inc., et al.*, No. 3:09–Civ–10 (TLS) (N.D.Ind. Nov. 20, 2009); *Reebok Int'l Ltd. v. Sebelen*, 930 F.Supp. 720, 723–24 (D.P.R.1996); *Dunkin' Donuts v. Mercantile Ventures, et al.*, No. EP–91–CA–154–B, 1992 WL 156566, at *10 (W.D.Tex. Jan. 8, 1992); *Reebok Int'l Ltd. v. Marnatech Enter., Inc.*, 737 F.Supp. 1515, 1517–20 (S.D.Cal.1989). Those Circuits have departed from the Second Circuit's tripartite *Vanity Fair* test, thereby diminishing the implications of that authority. *See McBee v. Delica Co., Ltd.*, 417 F.3d 107, 121 (1st Cir.2005); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 554–57 (9th Cir.1992); *Am. Rice, Inc. v. Ark. Rice Growers Coop.*, 701 F.2d 408, 414 n. 8 (5th Cir.1983). Second, and more importantly, Gucci has not submitted any evidence to demonstrate that it might have been harmed in such a fashion. While the Court appreciates that the instant dispute relates to discovery, and is therefore controlled by the discoverability standard articulated in the Federal Rules, it cannot find on the present record that Defendants' allegedly infringing conduct abroad harmed Gucci's reputation and marks, caused confusion, or diverted sales—all indicia of a "substantial effect" on United States commerce.

Gucci's evidentiary submission merely sheds light on Defendants' domestic conduct that supports various foreign operations. Assuming, for the sake of argument, that the standard in the Second Circuit permitted a finding of extraterritoriality on the basis of domestic conduct alone, Gucci's submitted evidence is still unpersuasive. The Trademark License Agreements were entered into between Guess? Licensing, Inc. and the licensee defendants, not between the licensees and foreign purchasers. *Cf. Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F.Supp. 78, 80 (S.D.N.Y.1989) (pre-*Atlantic Richfield*, finding the potential for a substantial effect on United States commerce because garments at issue were manufactured under a contract in New York and because remedies for its breach would have a substantial effect on United States commerce).

■ Similarly, for Guess, the presence of retail operations in Canada, the location of its "buying group" in Los Angeles, and the fact that products are advertised as shipped from a "warehouse[ ] in the U.S." only establish that Guess' Canadian operations are supported by domestic activity, not that those operations have a "substantial effect" on United States commerce. (Pl. Apr. 29 Letter at Tabs 1, 2, 3). *See, e.g., Totalplan*, 14 F.3d at 830–31 (rejecting extraterritorial application of Lanham Act where products were packaged and shipped from United States to Japan). Evidence that certain Defendants have domestic facilities for foreign shipping or that some decision-making regarding Defendants' foreign activities takes place in the United States does not by itself constitute a substantial effect on United States commerce. *See, e.g., Atl. Richfield*, 150 F.3d at 193 (finding that some domestic decision-making regarding defendant's foreign activities does not "trigger an extraterritorial application of the Lanham Act"); *World Book, Inc. v. Int'l Bus. Machs. Corp.*, 354 F.Supp.2d 451, 454 (S.D.N.Y.2005) (declining to find a "substantial effect" where the only domestic activity alleged to have occurred in support of infringing activity abroad is "the mere authorization of that activity").

Gucci's evidence that each of the licensees is required to, and does in fact, have a showroom in the United States is similarly insufficient. The licensees' physical presence in the United States is immaterial in

this dispute. Gucci has also submitted documents that purport to show that Marc Fisher solicits purchasers from around the world to attend shows in the United States where, presumably, those purchasers can obtain the products at issue. (See Pl. Apr. 29 Letter at Tabs 12, 15, 16, 17, 18). Gucci suggested the same during the April 22 conference, at which it offered that it would provide, as evidence of the "substantial effect" of defendant Marc Fisher's foreign activity, "an e-mail where Marc Fisher said, 'Everybody came in for the show and [the foreign customers] bought the new'— it happened to be the knockoffs of the diamond design that we've been talking about." (Apr. 22 Tr. 22:7–10). Gucci did not provide this e-mail, or any similar communications, with its April 29 submission. The submitted evidence establishes only that Marc Fisher participates in a show sponsored by a footwear trade association. It does not suggest that Marc Fisher actively solicits foreign purchasers or negotiates with purchasers for international distribution of its products. *See Piccoli*, 19 F.Supp.2d at 171 (applying Lanham Act extraterritorially where defendants sent promotional materials and invited prospective purchasers to U.S. showrooms to view, negotiate for, and purchase Calvin Klein jeans for international distribution).

Having not submitted any evidence regarding harm to its goodwill, consumer confusion, or diversion of sales, Gucci relies only on Defendants' domestic activity to bring their allegedly infringing foreign activity within the scope of the Lanham Act, Under the applicable Second Circuit standard, Defendants' domestic conduct by itself is insufficient to make the Lanham Act applicable extraterritorially.[5] Based on Gucci's evidentiary submissions, the Court is not convinced that the reopening of fact discovery to order production of information relating to Defendants' sales to foreign purchasers would be "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

### III. *CONCLUSION*

For the reasons set forth above, Gucci's request for permission to move for an order compelling Defendants to produce foreign sales and cost information relating to the allegedly infringing products is denied,

**SO ORDERED.**

---

**5.** Because Defendants' foreign activity does not have a substantial effect on United States commerce, the Court need not address the remaining two *Vanity Fair* factors. *See Atl. Richfield Co.,* 150 F.3d at 192 n. 4.