**JUICY COUTURE, INC., Plaintiff,**

v.

**BELLA INTERNATIONAL LIMITED, et al., Defendants.**

No. 12 Civ. 5801 (RA).

United States District Court, S.D. New York.

March 12, 2013.

494

Charles Albert Legrand, George Pearson Wukoson, Davis Wright Tremaine LLP, G. Roxanne Elings, Lewin & Laytin, New York, NY, for Plaintiff.

Bruce Homer Sales, Keir Joseph Loiacono, Gregg Adam Paradise, Lerner, David, Littenberg, Krumholz & Mentlik, LLP, Westfield, NJ, for Defendants.

## OPINION AND ORDER

RONNIE ABRAMS, District Judge:

Plaintiff Juicy Couture, Inc. ("Juicy" or "Plaintiff") brings this action against Defendants Bella International Limited, Juicy Girl Ltd., Gold Stable International Ltd., Goldstable International Corporation, John Suen, and Jessica Ching Ping Yang (collectively, "Defendants") asserting, *inter alia*, claims for trademark infringement, trademark counterfeiting and cybersquatting. Before the Court is Plaintiff's motion for a preliminary injunction seeking to enjoin Defendants from counterfeiting and infringing Plaintiff's trademarks. The Court finds that Plaintiff has demonstrated the need for a preliminary injunction. The Court declines, however, to exercise extraterritorial jurisdiction over Defendants' foreign activities. Accordingly, for the reasons that follow, Plaintiff's motion for a preliminary injunction is granted in part and denied in part.[1]

## I. Background [2]

### A. The Parties

Plaintiff, a California corporation, has sold fashion apparel and related accessories since 1997. (Craig Samuelson Declaration, Aug. 22, 2012 ("Samuelson Decl.") ¶ 2.) Juicy's collections are sold in Juicy Couture boutiques throughout the world in over 800 specialty stores and over 280 department stores in the United States. (*Id.* ¶ 11.) Plaintiff also maintains an online retail store at www.juicycouture.com. (*Id.*) Plaintiff has spent hundreds of millions of dollars advertising its products through traditional media as well as social media platforms such as Facebook, Twitter and YouTube. (*Id.* ¶ 9.) Juicy prides itself on having introduced a " 'California lifestyle' to the world—an 'irreverent, fun, and on-trend lifestyle brand.' " (*Id.* ¶ 7.) Its best known product is a velour tracksuit, which was introduced in 2001 and has since been worn by celebrities including Madonna, Jennifer Lopez and Gwyneth Paltrow, as have many of its other products. (*Id.* ¶¶ 7–8, 10.) Juicy products generated over $1.5 billion in sales from 2009 through 2011. (*Id.* ¶ 11.)

---

1. Plaintiff also names Alison Law as a defendant in this action. (Compl. ¶ 7; Pl.'s Mem. 1.) Ms. Law has not appeared and the Court has no reason to believe she has notice of this action or of Plaintiffs motion for a preliminary injunction. Defense counsel has indicated that it represents all Defendants except for Ms. Law. (Transcript of February 14, 2013 Hearing ("Tr.") 2–3.) Accordingly, this Order does not bind Ms. Law. *See* Fed.R.Civ.P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

2. The following facts are taken from the Complaint, hearing testimony and exhibits, as well as the parties' memoranda of law.

Defendants design, manufacture and sell apparel and accessories, and have been operating fashion retail shops since 1995. (John Suen Declaration, Sept. 29, 2012 ("Suen Decl.") ¶ 7.) Defendants sell their products under several different brands throughout the world, primarily in Hong Kong, the People's Republic of China and Macao. (*Id.* ¶ 4.) Their primary brand is Juicy Girl. (*Id.* ¶ 8.) All Defendants, with the exception of Goldstable International Corporation ("Goldstable Corp."), are Hong Kong corporate entities or citizens of, or individuals residing in, Hong Kong. (Countercls. ¶¶ 4–8.) Suen and Yang co-founded Bella Boutique Shop in Hong Kong in 1997 as a fashion retail shop. (Suen Decl. ¶ 1.) Their business, now under the umbrella of Bella International, Ltd. ("Bella"), has grown to include over fifteen stores. (*Id.* ¶ 7.) Defendants use

 

(List of Plaintiff's Registered Marks ("Samuelson Decl. Ex. A.").)[3] Plaintiff uses the Juicy Marks in connection with the sale of apparel and accessories, retail store services and online retail store services. (*Id.*) The Juicy Marks are among Plaintiff's most important and valuable assets. (*Id.* ¶ 14.)

Defendants use the marks JUICY GIRL, JUICYLICIOUS and JG in the promotion and sales of their Juicy Girl products. (Tamara Tarbutton Declaration, Aug. 17, 2012 ("Tarbutton Decl.") ¶¶ 26, 31; Nanny Munno Declaration, Aug. 6, 2012 ("Munno Decl.") ¶ 7.) Defendants also use the following design mark, which incorporates the phrase Juicy Girl, the initials JG, a crown and gothic lettering:

**3.** Plaintiff also asserts rights in numerous unregistered marks. This Opinion solely ad-

the social media platforms Facebook, Twitter and Sina Weibo (which is largely directed to consumers in the People's Republic of China) for promotion of their brands. (*Id.* ¶ 19.) Defendants spent over $250,000 in marketing and advertising in each of the last two years and had sales in 2011 of close to $13 million. (Suen Decl. ¶¶ 12–13.)

**B. The Relevant Trademarks and Their Use**

Plaintiff owns several federally registered trademarks (the "Juicy Marks"). These registered trademarks include JUICY, JUICY COUTURE, JUICY GIRL, CHOOSE JUICY, JUICY BABY, BORN IN THE GLAMOROUS USA and several design marks, including but not limited to the following:

 

While the majority of Defendants' sales are made abroad, Defendants have sold products containing these marks in the United States through the website www.juicygirl.com.hk (the "HK Website"). (Suen Decl. ¶ 16; Tarbutton Decl. ¶ 9; Munno Decl. ¶ 7.) The HK Website is maintained and operated in Hong Kong.

dresses Plaintiff's registered marks.

(Suen Decl. ¶ 14; Defs.' Opp'n 1.) It contains information about the Juicy Girl brand and is capable of accepting online orders from around the world through PayPal. (Suen Decl. ¶¶ 14, 17; Tarbutton Decl. ¶¶ 6, 13.)[4] All of Defendants' known sales to the United States, which total less than $3,000, were made through this website. (Suen Decl. ¶ 16.) A portion of these sales were made to Plaintiff's investigators in connection with this litigation. (*Id.*) Plaintiff's investigators ordered, purchased and received Defendants' merchandise from the HK Website. (Tarbutton Decl. ¶¶ 23, 25–26, 31; Munno Decl. ¶¶ 5–7.) The clothing and packaging delivered to the investigators in the United States displayed the marks in question. (Tarbutton Decl. ¶¶ 26, 31; Munno Decl. ¶ 7.)

A google.com search for "Juicy Girl" yields Plaintiff's website as the first hit (which appears to be a paid advertisement) and Defendants' website as the second unpaid hit. (Screenshot of google.com search ("Tarbutton Decl. Ex. F.").)

## C. Procedural History

In 2008, Plaintiff sued Defendants for trademark infringement in Hong Kong (the "Hong Kong action"). (Suen Decl. ¶ 25.) Discovery in the Hong Kong action has been completed and the parties anticipate a trial sometime in 2013. (Defs.' Opp'n 8; Transcript of February 14, 2013 Hearing ("Tr.") 11.)

■ On July 27, 2012, Plaintiff filed a complaint against Defendants in this Court alleging the following six causes of action: (1) trademark infringement and counterfeiting pursuant to 15 U.S.C. § 1114; (2) unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a); (3) cybersquatting pursuant to the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1); (4) unlawful deceptive acts and practices under New York Business Law; (5) common law trademark infringement; and (6) common law unfair competition. (Compl. ¶¶ 44–78.) The instant motion, filed on August 27, 2012, seeks to enjoin Defendants from the following during the pendency of this action:

1. Using the Juicy Marks, or any reproduction, counterfeit, copy or colorable imitation of the Juicy Marks in connection with the distribution, advertising, offer for sale and/or sale of merchandise not the genuine products of Plaintiff;

2. Passing off, inducing or enabling others to sell or pass off any infringing products as and for Juicy Couture products;

3. Shipping, delivering, holding for sale, distributing, returning, transferring or otherwise moving, storing or disposing of in any manner apparel or other items falsely bearing the Juicy Marks, or any reproduction, counterfeit, copy or colorable imitation of same; and

4. Utilizing the [Defendants' websites] and registering any additional domain names that use or incorporate any of the Juicy Marks.

(Pl.'s Mot. 2.) Plaintiff's motion also requests that the Court "further order[ ], to effect the requested relief, that, during the pendency of this [a]ction, Defendants' websites ... be disabled by the appropriate domain name registries or registrars." (*Id.*) After the motion was fully briefed and limited discovery was conducted, the

---

4. Defendants also own or control three other domain names: (1) www.juicylicious.us, (2) www.juicygirl.us, and (3) www.justglam.us. (Suen Decl. ¶ 20.) These websites do not offer products for sale and have never been used to make sales to the United States. (*Id.*) Plaintiff alleges that Defendants are also registrants of the website www.juicylicious.com.hk. (Compl. ¶ 26; Tarbutton Decl. ¶¶ 16–17.)

Court held an evidentiary hearing and heard oral argument on February 14, 2013.[5]

## II. Preliminary Injunction Standard

 "A preliminary injunction is an extraordinary remedy." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir.2010); *Bulman v. 2BKCO, Inc.*, 882 F.Supp.2d 551, 557 (S.D.N.Y.2012). A court can also grant a preliminary injunction "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claim, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598

F.3d 30, 35 (2d Cir.2010). The party seeking the injunction must demonstrate "by a clear showing" that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## III. Discussion

### A. Likelihood of Success on the Merits

 In arguing its likelihood of success on the merits, Plaintiff principally relies on its claim for trademark infringement pursuant to Section 32 of the Lanham Act.[6] Section 32(a) of the Lanham Act prohibits the use in commerce, without consent, of any "registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods," in a way that is likely to cause confusion. 15 U.S.C. § 1114(1)(a). To prevail on an infringement action, a plaintiff must demonstrate: (1) "that it has a valid mark entitled to protection," and (2) "that the defendant's use of that mark is likely to cause confusion." *Time, Inc. v. Petersen Publ'g Co. LLC*, 173 F.3d 113, 117 (2d Cir.1999);

---

5. In their opposition brief and at the evidentiary hearing, Defendants referenced the parties' settlement discussions. (Defs.' Opp'n 7–8; Tr. 7–8.) Federal Rule of Evidence 408 bars the use of settlement evidence to establish the validity or invalidity of a claim but permits the admission of such evidence if offered for another purpose. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999). Defendants assert that the evidence should not be excluded by Rule 408 because it provides a "procedural context" for "why ... [P]laintiff chose to bring a U.S. action four years after starting an action in Hong Kong" and is not offered to prove the invalidity of Plaintiff's claim. (Tr. 14.) The Court rejects this argument and finds in any event, that the evidence's probative value is outweighed by the danger of unfair prejudice pursuant to Rule 403. *See Sanders v. Madison Square Garden, LP*, 525 F.Supp.2d 364, 368 (S.D.N.Y. 2007) ("[E]ven if the evidence is not excluded definitively by Rule 408, like any evidence it

must pass Rule 403's test."); *see also Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510–11 (2d Cir.1989) ("As a general proposition, a trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.' "). Accordingly, all references to the parties' settlement discussions and positions are to be stricken from the record.

6. Because the Court grants a preliminary injunction based on Plaintiff's infringement claim and finds this remedy to be sufficient to cure the irreparable harm to Plaintiff, the Court need not address Plaintiff's cybersquatting claim as it pertains to Defendants' U.S. based websites, counterfeiting claim, or unfair competition claim. The Court does not address Plaintiff's cybersquatting claim as it pertains to the HK Website because, as discussed below, the Court declines to exercise jurisdiction over that foreign website.

*Chloe v. Queen Bee of Beverly Hills, LLC,* No. 06 Civ. 3140(RJH), 2011 WL 3678802, at *3 (S.D.N.Y. Aug. 19, 2011).

■ Courts look to the following factors, enumerated in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir. 1961), to determine whether a likelihood of confusion exists between two sets of marks: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior user's product market; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market. *Id.* at 495. "[E]ach factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product." *Brennan's Inc. v. Brennan's Rest., LLC,* 360 F.3d 125, 130 (2d Cir.2004) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir.1986)). Because the analysis for the first prong of an infringement claim—whether a trademark is valid and entitled to protection—overlaps with the analysis used to assess the first *Polaroid* factor—strength of Plaintiff's mark— the Court discusses the strength and validity of the Juicy Marks together. *See Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 391 (2d Cir.1995) ("A court's inquiry regarding the strength of a mark often parallels the inquiry concerning the mark's validity, inasmuch as the strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.") (citations and internal quotation marks omitted).

### 1. Validity and Strength of Plaintiff's Marks

■ "The strength of a particular mark is measured by the degree to which it indicates source or origin of the product." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 269 F.3d 114, 123 (2d Cir. 2001). A mark's strength may be based on its inherent distinctiveness or the distinctiveness it has acquired in the marketplace. *See Brennan's,* 360 F.3d at 130–31. Registered marks are presumptively distinctive, although this can be overcome by showing that a registered mark is generic or is descriptive without secondary meaning. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976); *Giggle, Inc. v. netFocal, Inc.,* 856 F.Supp.2d 625, 629–30 (S.D.N.Y.2012). "[W]hen a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of [the] mark's protectibility by a preponderance of the evidence." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 192 F.3d 337, 345 (2d Cir.1999). Defendants have not presented any evidence that the presumption is inapplicable in this instance. Accordingly, the Juicy Marks "should be afforded the utmost protection." *Lois Sportswear,* 799 F.2d at 871.

■ Furthermore, Plaintiff has demonstrated that these marks have acquired distinctiveness. In determining whether a mark has acquired distinctiveness, courts consider a number of non-exhaustive factors: (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to the source. *See Thompson Med. Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985). No one factor is determinative, and not all factors need be proved. *L &*

*JG Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir. 1996). Plaintiff has spent "hundreds of millions of dollars on advertising and promoting goods and services offered in connection with the Juicy Marks" and Juicy products generated over $1.5 billion in sales from 2009 through 2011 alone. (Samuelson Decl. ¶¶ 10–13.) Plaintiff has also been the subject of widespread media coverage, both solicited and unsolicited. Its products, including but not limited to its "signature" velour tracksuit, have been used in popular movies, television shows and print media, and have been worn by a long list of Hollywood celebrities. (*Id.* at ¶ 10.)

Given the degree of protection afforded to registered marks and the acquired distinctiveness of the Juicy Marks, the marks are valid and deserving of protection, satisfying the first element of an infringement claim, and are strong marks, providing persuasive support for a finding of a likelihood of confusion under the first *Polaroid* factor.

### 2. The Similarity of the Marks

When evaluating the similarity of marks, "courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir.1993). Defendants' marks, JUICY GIRL, JUICYLICIOUS and JG are similar, if not identical (i.e., Juicy Girl), to the Juicy Marks in name alone. The contexts in which they are found are likely to cause further confusion. The design mark utilized by Defendants shown above, in Section Part I.B., for example, is similar in both name and design to a number of Plaintiff's marks. That design mark incorporates the word "Juicy," the initials "JG," a stylized gothic script, and the image of a crown similar to that used in some of Plaintiff's marks. The images below, with Plaintiff's on the left and Defendants' on the right, provide another example of the similarities between one of Defendants' marks and one of Plaintiff's:

Juicy Couture

(Samuelson Decl. Ex. A)

(Suen Deposition Ex. 20.)

The parties' marks also appear in similar contexts as both are used in the sale, packaging and promotion of women's apparel and accessories. Both parties use their marks on the products themselves, as well as in advertisements and promotions in traditional and social media outlets. Plaintiff has presented compelling evidence of similarities between its advertising campaigns and Defendants' promotional materials, called "stylebooks." (Tr. 84; Pl.'s Hearing Exs. 3–5.) Two promotional images presented at the hearing, for example, featured a blonde woman modeling a black tracksuit with gold writing along the pant leg—Plaintiff's which says Juicy Couture and Defendants' which says JG (Samuelson Dec. ¶ 15; Screenshot from www.juicylicious.com.hk ("Tarbutton Decl. Ex. N").) Both images also use gothic letter-

ing—Defendants' on the tracksuit and Plaintiff's in the advertisement's text. (*Id.*) Defendants' stylebooks also contain many key themes and motifs found in Plaintiffs marketing materials, primarily what has been characterized as a "California-based" setting and theme. Other similarities include the use of a similar color pink, and motifs such as hearts, graffiti, the British flag and leopard and tartan prints. (Tr. 77–84; Pl.'s Hearing Exs. 3–5.) Because of these similarities—between both the marks themselves and the context in which they are used—an ordinary consumer could conclude that the products derive from the same source. *See Stix Prods. Inc. v. United Merchs. & Mfrs., Inc.,* 295 F.Supp. 479, 493–94 (S.D.N.Y. 1968). This factor favors Plaintiff.

### 3. The Competitive Proximity of the Products.

The third *Polaroid* factor considers the extent to which the parties' products compete with each other for customers. *See Brennan's,* 360 F.3d at 134. In considering this factor, courts examine "the nature of the products themselves and the structure of the relevant market," including "the manner in which the products are advertised, and the channels through which the goods are sold." *Cadbury Beverages v. Cott Corp.,* 73 F.3d 474, 480 (2d Cir.1996) (citing *Vitarroz v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981)). Here, the parties' products are advertised and sold in the same channels. Both parties sell apparel and accessories on the Internet and target women and girls as consumers.

One distinguishing feature, however, is that Defendants have only sold products in the United States through the Internet, whereas a substantial percentage of Plaintiff's sales in the United States are through brick and mortar stores. This means that shoppers who exclusively purchase in retail locations will not be at risk

of encountering Defendants' products and being confused as to the source of the goods. *See New Look Party Ltd. v. Louise Paris Ltd.,* No. 11 Civ. 6433(NRB), 2012 WL 251976, at *7 (S.D.N.Y. Jan. 11, 2012) (finding "the fact that plaintiff does not sell its clothing in any physical locations in the United States" when the defendant does "weighs heavily against finding a likelihood of confusion"). Nonetheless, insofar as Defendants' products are available online to United States consumers, the parties' products are in close competitive proximity. Accordingly, this factor weighs in favor of Plaintiff.

### 4. Whether Plaintiff Will Bridge the Gap

"The term 'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." *NYC Triathlon LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 338 (S.D.N.Y.2010) (quoting *CLASS Promotions, Inc. v. DS Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)). No evidence has been presented of a gap of this sort. This factor thus favors neither party.

### 5. Actual Confusion

Plaintiff has not presented any evidence of actual confusion and this factor similarly favors neither party. The Court notes, however, that "actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Savin Corp. v. Savin Grp.,* 391 F.3d 439, 459 (2d Cir.2004) (quoting *Lois Sportswear,* 799 F.2d at 875).

### 6. Bad Faith

The "inquiry into willfulness or bad faith 'considers whether defendant

adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.,* 440 F.Supp.2d 249, 278 (S.D.N.Y.2006) (quoting *Savin,* 391 F.3d at 460). Plaintiff argues that bad faith is evidenced by Defendants' knowledge of Plaintiff's U.S. rights in the Juicy Marks since at least early 2008 (when Plaintiff initiated the Hong Kong action) and Defendants' subsequent efforts to sell their products in the United States. (Pl.'s Mem. 16.)

Defendants maintain that they were the first to use the Juicy Girl mark in Hong Kong—a contention that is being actively litigated in the Hong Kong action—but make no representation that they were unaware of Plaintiff's marks when they began to sell to consumers in the United States. Nonetheless, there is no direct evidence in the record before the Court that Defendants entered the U.S. market with the intention of "capitalizing on plaintiff's reputation and goodwill." *See De Beers,* 440 F.Supp.2d at 278. According to Defendants, their sales to the U.S. are *"de minimis"* and "[i]n its normal course of business, [they] do[ ] not direct [their] advertising or marketing to the U.S." (Defs.' Opp'n 5–6.) While the glaring similarities between the marks and the context in which they are used suggest Defendants' bad faith, the Court hesitates to make such a finding at this stage, particularly given Defendants' outstanding claim to rightful ownership of the mark abroad, and the Court need not do so in light of its ultimate ruling.

### 7. Quality of the Products

This factor requires the Court to "consider[ ] whether the senior user's reputation could be 'tarnished by [the] inferior merchandise of the junior user.'" *Cadbury Beverages,* 73 F.3d at 483 (2d Cir.1996) (quoting *Scarves by Vera, Inc. v. Todo Imps. Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976)). As a result, this factor "goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin Enters., Ltd. v. Nawab,* 335 F.3d 141, 152 (2d Cir.2003). Plaintiff argues that Defendants' products are of an inferior quality and claims that as a result, there is a strong risk that Defendants' use of the Juicy Marks will "jeopardize Plaintiffs highly regarded and longstanding reputation." (Pl.'s Mem. 17.) Defendants have submitted evidence of Hong Kong celebrity consumers and press coverage and accolades from the Hong Kong community, creating some doubt as to whether and to what degree, Defendants' products are viewed in an inferior light. (Suen Decl. ¶¶ 9–11.) At this stage, without having examined the products themselves or having received evidence of a disparity in quality, the Court is unable to make a finding on this issue.

### 8. Consumers' Sophistication

The final *Polaroid* factor is "grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion." *Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F.Supp. 279, 300 (S.D.N.Y.1997). Courts have held that shopping for casual apparel does not require a heightened degree of care by the purchaser. *See, e.g., THOIP v. Walt Disney Co.,* 736 F.Supp.2d 689, 714–15 (S.D.N.Y.2010) ("[A]lthough a consumer can be expected to "examine the shirt, consider alternatives, and even try it on," the purchase of a relatively inexpensive t-shirt does not call for "any degree of sophistication."); *Phillips–Van Heusen Corp. v. Calvin Clothing Co.,* 444 F.Supp.2d 250, 257 (S.D.N.Y.2006) ("[T]he average clothing customer is not particularly sophisticated."). A prior decision in this district, however, has found that "consumers who are aware of [Juicy] Couture

are fashion conscious" and "likely to be relatively sophisticated shoppers," *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* No. 04 Civ. 7203(DLC), 2006 WL 1012939, at \*29 (S.D.N.Y. Apr. 19, 2006), a proposition Juicy does not appear to dispute. (Pl.'s Mem. 18.) This factor does not favor either party.

\* \* \*

■ Having considered each of the *Polaroid* factors, the Court finds that Plaintiff has demonstrated a likelihood of confusion. The strength of Plaintiffs marks, similarities of the parties' marks and their competitive proximity, often considered the three most significant factors, all strongly favor Plaintiff. *See Marks Org., Inc. v. Joles,* 784 F.Supp.2d 322, 330 (S.D.N.Y.2011) ("[C]ourts generally hold that the first three factors [of the *Polaroid* test] are the most significant."); *NYC Triathlon,* 704 F.Supp.2d at 341 (citing *Mobil Oil Corp. v. Pegasus Petrol. Corp.,* 818 F.2d 254, 258 (2d Cir.1987)).

### B. Irreparable Harm to Plaintiff Absent Injunctive Relief

■ "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.' " *Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009) (quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 234 (2d Cir.1999)). "To satisfy the irreparable harm requirement, plaintiff[ ] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (alterations and internal quotation marks omitted). Furthermore, a plaintiff must show "that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari,*

295 F.3d 206, 214 (2d Cir.2002) (internal quotation marks omitted).

■ "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark ... because loss of control over one's reputation is neither 'calculable nor precisely compensable.' " *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.,* 800 F.Supp.2d 515, 540 (S.D.N.Y.2011); *NYC Triathlon,* 704 F.Supp.2d at 343 ("Prospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm.") (citing *Tom Doherty Associates v. Saban Entm't, Inc.,* 60 F.3d 27, 37–38 (2d Cir.1995)). Plaintiff has invested substantial effort and resources in developing the goodwill associated with the Juicy Marks. Defendants' infringement in the United States puts that goodwill at risk by limiting Plaintiff's ability to control its brand. *See Stern's Miracle–Gro Prods., Inc. v. Shark Prods., Inc.,* 823 F.Supp. 1077, 1094 (S.D.N.Y. 1993) (plaintiff's expenditure of $100 million establishing its brand contributed to potential hardship if defendant was not enjoined from further use of the "Miracle Gro" mark); *Bulman,* 882 F.Supp.2d at 564 (likelihood of "future confusion" and "prospective loss of goodwill" despite no claim of "lost business, sales or revenues" sufficient to establish irreparable harm). Furthermore, although irreparable harm may not be presumed upon a showing of likelihood of success on the merits, *see eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 393, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), a party's demonstration of a likelihood of success on an infringement claim often foretells a finding of irreparable harm. *See Marks Org.,* 784 F.Supp.2d at 334 ("[A]lthough a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury."). The Court finds that to be the case here.

Defendants argue that Plaintiff's delay in seeking a preliminary injunction precludes a finding of irreparable harm. Delay in seeking a preliminary injunction can weaken a claim of irreparable harm because "the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). Prior to the Second Circuit's decision in *Salinger*, a finding of delay defeated the presumption of irreparable harm. *See, e.g., Weight Watchers Int'l. Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005). Now that courts may not presume irreparable harm, however, the effect of a finding of delay is uncertain. *See Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277, 282 (S.D.N.Y.1998) ("[T]he Court of Appeals has not yet held that unexcused delay alone necessarily defeats a preliminary injunction motion."); *New Look*, 2012 WL 251976, at *10 ("[Delay] is now simply one factor to be considered in determining whether a plaintiff will, in fact, suffer irreparable harm in the absence of a preliminary injunction."); *Marks Org.*, 784 F.Supp.2d at 333 ("[*Salinger*] leaves open the question of what effect Plaintiff's delay should have on the Court's determination of irreparable injury."). Courts recognize, however, that a plaintiff's good faith efforts to investigate infringement can justify delay. *Tough Traveler*, 60 F.3d at 968.

Plaintiffs have known about Defendants' sales to the United States since at least July 16, 2012 and perhaps as early as April 2012. (Tarbutton Decl. ¶ 26; Defs.' Opp'n 9.) Plaintiff represents that from this time until the filing of the motion it was continuing to investigate the extent of Defendants' domestic activities. (Pl.'s Reply 2.) While Plaintiff's delay may call into question its sense of urgency, the Court does not find the amount of time Plaintiff took to move for preliminary relief to be unreasonable. *See, e.g., Bulman*, 882 F.Supp.2d at 564–65 (delay of several months did not preclude finding of irreparable harm); *Marks Org.*, 784 F.Supp.2d at 332–36 (granting preliminary injunction despite nearly sixteen-month delay between learning of infringing conduct and filing of motion).

### C. Balancing the Hardships

A court must also "consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger*, 607 F.3d at 80. If Defendants continue to sell their products in the United States, Plaintiff faces potential loss of sales, goodwill and control over its reputation. By contrast, enjoining Defendants from using the Juicy Marks in connection with sales or advertising in the United States would not present significant hardship because their current sales in the United States are minimal, particularly in comparison to their sales in Hong Kong, Macao, and the People's Republic of China. Such an injunction would not affect the mainstay of Defendants' business. Thus, the balance of hardships tips in Plaintiff's favor with regard to a carefully tailored injunction.[7]

7. The analysis is quite different with regard to Plaintiff's request for an injunction disabling Defendants' domain names that are hosted in Hong Kong. Defendants' business in Asia, which earned nearly $13 million in 2011, in contrast to the approximate $3,000 worth of sales made to the United States, depends significantly on the use of its HK Website. (Suen Decl. ¶ 31.) The Court is convinced that disabling Defendants' HK Website would cause great hardship to Defendants. In light of the Court's ruling that the Lanham Act should not be extraterritorially applied, however, the hardship of disabling the HK Website need not be addressed at this time.

### D. Public Interest

 Finally, the Court must "ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger,* 607 F.3d at 80 (quoting *eBay,* 547 U.S. at 391, 126 S.Ct. 1837). The Second Circuit has long held that there is a "strong interest in preventing public confusion." *ProFitness Phys. Therapy Ctr. v. Pro–Fit Ortho. and Sports Phys. Therapy P.C.,* 314 F.3d 62, 68 (2d Cir.2002). Plaintiff has established that Defendants' actions are likely to cause consumer confusion. Therefore, the public interest would not be disserved by the issuance of a preliminary injunction.

\* \* \*

In sum, Plaintiff has demonstrated that (1) it is likely to succeed on the merits of its trademark infringement claim; (2) it is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships tips in its favor; and (4) the public interest will not be disserved by the issuance of an injunction. Accordingly, injunctive relief is appropriate. The remaining question, however, is the proper scope of that injunction.

### IV. Extraterritorial Application of the Lanham Act

Defendants argue that this action "is predicated on a false premise that this Court has jurisdiction over [Defendants'] Hong Kong website www.juicygirl.com.hk based on the *de minimis* sales made to the United States." (Defs.' Opp'n 18.) They argue that the broad injunction Plaintiff seeks requires the improper extraterritorial application of the Lanham Act.

 It is well-established that United States courts have jurisdiction to apply the Lanham Act to allegedly infringing conduct occurring outside the United States when necessary to prevent harm to United States commerce. *See Steele v. Bulova Watch Co.,* 344 U.S. 280, 285–86, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (affirming an injunction prohibiting a U.S. citizen from selling fake watches in Mexico in part because such sales adversely affected the trademark holder in America). In *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2d Cir.1956), the Second Circuit articulated three factors to consider when determining whether the Lanham Act should be applied to extraterritorial conduct: (1) whether the defendant is a United States citizen; (2) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's trademark rights under domestic law; and (3) whether the defendant's conduct has a substantial effect on United States commerce. *Id.* at 642; *Atl. Richfield Co. v. ARCO Globus Int'l Co.,* 150 F.3d 189, 192 (2d Cir.1998). "[T]he absence of one of the above factors might well be determinative," and the absence of two "is certainly fatal." *Vanity Fair,* 234 F.2d at 643; *see also Totalplan Corp. of Am. v. Colborne,* 14 F.3d 824, 831 (2d Cir.1994) (observing that the absence of two factors "is fatal to an argument that the conduct is governed by the Lanham Act"). "[C]ourts are to balance the factors in deciding whether the 'contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.'" *Software AG Inc. v. Consist Software Solutions, Inc.,* No. 08 Civ. 389(CM), 2008 WL 563449, at \*14 (S.D.N.Y. Feb. 21, 2008) (quoting *Warnaco, Inc. v. VF Corp.,* 844 F.Supp. 940, 950 (S.D.N.Y.1994)).

While several provisions of Plaintiff's proposed injunction do not implicate principles of extraterritoriality, Plaintiff seeks, *inter alia,* an order that would disable the HK Website, which is owned, operated and hosted in Hong Kong. Having balanced the *Vanity Fair* factors, the Court concludes that extraterritorial application of the Lanham Act is inappropriate at this time.

## A. Citizenship of Defendants

 "[W]hen a plaintiff has sought to extend the Lanham Act to the foreign activities of foreign defendants, courts have scrutinized with care the nexus between the foreign defendant's activities within the United States and the conduct giving rise to the Lanham Act claims." *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 955 F.Supp. 220, 228–29 (S.D.N.Y.1997). It is uncontested that five out of the six defendants in this case are not citizens of the United States. While in some cases it may be proper to ignore certain defendants' foreign citizenship—for instance when principal defendants are United States citizens, *id.* at 231—Plaintiff has not shown why the citizenship of only one of the six defendants is sufficient in this instance.

In each of the cases cited by Plaintiff in which a court applied the Lanham Act extraterritorially to a foreign defendant, other factors were present which justified treating that defendant as a U.S. citizen, such as the defendant's residence in the United States or exercise of considerable control over a U.S. corporation engaging in infringing activities. *See A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 126 F.Supp.2d 328, 337 (S.D.N.Y.2001) (finding that defendant, who "resided in and [had] done business in the United States for over forty years" was a "constructive" U.S. citizen); *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F.Supp. 78, 80 (S.D.N.Y.1989) (finding that a foreign defendant could be treated as a U.S. citizen because he "resid[ed] in New York and was the controlling force behind" a New York corporation); *A.T. Cross Co. v. Sunil Trading Corp.*, 467 F.Supp. 47, 50 n. 5 (S.D.N.Y.1979) (applying Lanham Act extraterritorially to foreign defendant who had resided in the U.S. for six years, because "he was in all respects acting in his capacity as an officer of a New York cor-

poration when engaged in the purchase and sale of the counterfeit pens").

Here, however, there is no evidence that the single U.S. citizen defendant, Goldstable Corp., exercised any control over Defendants' operations, let alone the type of control that would permit the Court to ignore the foreign status of the five remaining defendants. Indeed, the only evidence in the record of Goldstable Corp.'s role in the alleged infringement is that the products sold to Plaintiff's investigators contained a registration number linked to Goldstable Corp. in a Federal Trade Commission database at an address associated with Defendant Yang. (Tarbutton Decl. ¶¶ 27–29.) Moreover, there is testimony in the record that Goldstable Corp. was not involved in the sales or marketing of the Juicy Girl brand but rather was established for another one of Defendants' apparel brands. (Deposition of John Suen 64:13–25.) The evidence of Goldstable Corp.'s role in the infringing activity thus provides no nexus between the foreign Defendants' activities in the United States and the infringing conduct. *See Aerogroup*, 955 F.Supp. at 228–29. This factor weighs against extraterritorial application.

## B. Conflict with Foreign Law

 The next *Vanity Fair* factor, which requires the Court to consider whether a conflict exists with trademark rights under foreign law, also weighs against extraterritorial application of the Lanham Act. The Lanham Act should not be applied extraterritorially against defendants "acting under presumably valid trade-marks in a foreign country." *Vanity Fair*, 234 F.2d at 643. The Second Circuit based this conclusion on "practical considerations such as the difficulty of obtaining extraterritorial enforcement of domestic law, as well as on considerations of international comity and respect for national

integrity." *Id.* at 639. Although unresolved questions about foreign trademark law present in this case "are not sufficient by themselves to deny [plaintiff] the protections of the Lanham Act," they are "sufficient to increase this Court's caution in exercising jurisdiction over matters more appropriately left to [foreign] courts." *Aerogroup,* 955 F.Supp. at 231. Presumably, the outcome of the Hong Kong action will determine whether Defendants have enforceable intellectual property rights to the Juicy Girl mark in that country. Although this Court is not prevented from applying the Lanham Act extraterritorially before a decision in that action is reached, it must proceed with caution in determining whether to do so.

### C. Substantial Effect on United States Commerce

■ Lastly, the Court considers whether Defendants' infringement has a substantial effect on United States commerce. Congress sought to limit extraterritorial application of the Lanham Act to "foreign uses that have significant trademark-impairing effect upon American commerce." *Sterling Drug. Inc. v. Bayer AG,* 14 F.3d 733, 746 (2d Cir.1994) (instructing district court, on remand, to craft injunction that prohibits only those uses of mark abroad that have substantial effect on U.S. commerce).

One way in which the substantial effect on U.S. commerce prong may be met is through a showing of consumer confusion or harm to the plaintiff's reputation. *See Bulova,* 344 U.S. at 286, 73 S.Ct. 252 (upholding extraterritorial application of the Lanham Act in part because of evidence that the defendant's goods resulted in confusion and led to a substantial effect on U.S. commerce); *Gucci Am., Inc. v. Guess?, Inc.,* 790 F.Supp.2d 136, 143 (S.D.N.Y.2011) ("[A] showing of consumer confusion or harm to plaintiff's goodwill in the United States is sufficient to demon-

strate a 'substantial effect on United States commerce.' "); *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 170 (S.D.N.Y.1998); *cf. Atl. Richfield,* 150 F.3d at 192 (finding no substantial effect citing absence of "evidence that domestic consumers have been misled or have come to view the [ ] mark less favorably as a result of [the] foreign activities"). Cases have also noted that "where the likelihood of consumer confusion or harm to a protected plaintiff's reputation is great, the substantial effect test has been satisfied," *A.V. by Versace,* 126 F.Supp.2d at 340, although those cases have tended to rely on proof of actual confusion.

Plaintiff argues that Defendants' actions have a substantial effect on U.S. commerce because Defendants' infringement causes, and is intended to cause, confusion in the United States. With regard to the HK Website, Plaintiff asserts that the site is available in English, indicates that Juicy Girl sells its products worldwide, and includes information on international shipping costs. (Tarbutton Decl. ¶¶ 5–8.) It further relies on the evidence that the HK website is the second unpaid hit resulting from a google.com search of "Juicy Girl" to show not only the likelihood of confusion between the parties' products, but the effect of Defendants' infringement on U.S. commerce as well as Plaintiff's business. Plaintiff also notes that Defendants filed an application for registration of the trademark "Juicy Girl" with the United States Patent and Trademark Office, which required Defendants to acknowledge their "bona fide intention to use" the mark in the United States. (Elias Decl. ¶ 8; Defendants' USPTO Application ("Elias Decl. Ex. D").)

Plaintiff also argues that Defendants' U.S. sales constitute sufficient evidence of a substantial effect on U.S. commerce. It cites *Fun–Damental Too, Ltd. v. Gemmy*

**508**

*Indus. Corp.,* 111 F.3d 993, 1006 (2d Cir. 1997), in which the Second Circuit found that "the importation of products ... clearly has a substantial impact on United States commerce." In *Fun–Damental,* a U.S. company sought to sell its products, imported from China, wholesale to a major toy and novelty retailer. *Fun–Damental,* 111 F.3d at 997. In this case, by contrast, the only evidence of sales to the United States totals $3,000 worth of products, a portion of which consists of the sales made to Plaintiff's investigators.

Even if Plaintiff is correct that evidence of likelihood of confusion, an intent to increase domestic activity and limited sales to the U.S. from a foreign website suffices to satisfy the substantial effects prong of the *Vanity Fair* test, it is insufficient to overcome Plaintiff's failure to prove that either of the remaining factors weighs in its favor.

\* \* \*

Accordingly, balancing the *Vanity Fair* factors, the Court finds that extraterritorial application is inappropriate at this time. Should further discovery or other information warrant the Court's reconsideration of this issue, Plaintiff will have the opportunity to present it in connection with a motion for a permanent injunction. At the preliminary injunction stage, however, the Court concludes that the Lanham Act should not be applied extraterritorially to enjoin Defendants' activity on the HK Website, or any other websites hosted abroad.

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is granted in part and denied in part. Plaintiff is directed to submit a proposed order consistent with this Opinion by March 18, 2013. Defendants shall submit any opposition to Plaintiffs proposed order by March 22, 2013. By March 18, 2013, the parties shall also submit individual letters, no longer than two pages, addressing the appropriate security to be posted by Plaintiff. *See* Fed.R.Civ.P. 65(c).

SO ORDERED.